IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. BRADLEY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DONTEVIAN L. BRADLEY, APPELLANT.

Filed August 14, 2018.    No. A-17-644.

Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Affirmed.

Matthew K. Kosmicki for appellant.

Douglas J. Peterson, Attorney General, and Joe Meyer for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Dontevian L. Bradley was convicted by a jury of possession of a deadly weapon (firearm) by a prohibited person, terroristic threats, use of a deadly weapon (firearm) to commit a felony, and tampering with a witness. He was found not guilty of a third degree domestic assault charge. The Lancaster County District Court sentenced Bradley to consecutive sentences totaling 18 to 27 years' imprisonment. Bradley raises a number of errors on appeal; we affirm.

## II. BACKGROUND

On the morning of November 15, 2016, Bradley was arguing with his girlfriend outside an apartment building. Roofers working on a nearby house verbally intervened after the argument became physical. Bradley, upset at the roofers' intervention, procured a handgun from nearby and pointed it at the roofers while threatening them. Bradley then resumed arguing with his girlfriend. The police were called, and Bradley was arrested. The police were unable to locate a handgun.

## 1. PROCEDURAL BACKGROUND

A criminal complaint was filed against Bradley in the county court for Lancaster County on November 16, 2016, charging him with possession of a firearm by a prohibited person and terroristic threats. His initial bond was set at "$50,000 Ten Percent Allowed." His case was bound over to the district court, and on January 4, 2017, an information was filed charging Bradley with possession of a firearm by a prohibited person, terroristic threats, and third degree domestic assault.

Bradley filed a motion for a bond review hearing and the State filed a motion to amend the information. A hearing on those motions took place on January 9, 2017. The court granted the State's motion and an amended information was filed adding a charge for tampering with a witness or informant. Bradley's motion to reduce his bond amount was denied.

The State filed a second motion to amend the information on February 22, 2017. A hearing took place on February 23, and the State was granted leave to file a second amended information adding a charge for use of a firearm to commit a felony. Bradley's counsel made an oral motion to reduce his bond amount to "$40,000, 10 percent," but the court denied the motion. The court stated that a "$50,000 percentage bond based upon these charges, I think, is, frankly, a gift." The State also filed a motion to endorse three additional witnesses on April 20, which the court granted; only one of the additional witnesses, Ty S., ended up testifying.

On May 2, 2017, the day before trial was to commence, a hearing for "a bond swear" took place. Bradley had posted the previously set bond, however, the State made an oral motion to increase Bradley's bond to "$100,000, percentage" based on the additional charges and its assertions that several of its witnesses had reported being threatened regarding their involvement in the case. The State's motion was granted, and Bradley's bond was increased to "$100,000, percentage." Bradley also made an oral motion at the hearing to continue the trial in order to depose a witness (the girlfriend), which the court denied.

## 2. TRIAL

Bradley's trial commenced on May 3, 2017. During trial, the parties stipulated that Bradley had previously been convicted of a felony. A summary of the pertinent testimony follows.

### (a) State's Evidence

### *(i) Evidence Relevant to Firearm and Terroristic Threats Charges*

Bradley was 20 years old at the time of trial. His girlfriend was 17 years old. (We will continue to refer to this person as Bradley's girlfriend although she testified at trial that she and Bradley had broken up "[m]onths ago.") Bradley's girlfriend testified that she went to see Bradley at his apartment to "argue with him" at approximately 4 a.m. on the morning of November 15, 2016. She had seen him with another female on a mutual friend's "Snapchat." The other female, who was 16 years old, was at Bradley's apartment when she arrived. Bradley and his girlfriend began arguing, and at some point the argument moved outside. Bradley told his girlfriend to leave, which she did, but she returned when she realized she did not have her cell phone. She and Bradley began arguing again, and the argument became physical. Bradley held her against a wall by her throat, and she acknowledged that Bradley had also hit her in the face, but she did not recall exactly

when that happened or how he hit her. Nearby roofers began to yell down to intervene, and Bradley responded to them "to mind their business." The girlfriend walked away for a couple of minutes, and when she returned, Bradley was in the middle of the alley and "everybody was yelling." The girlfriend said Bradley hit the windshield of her car with his fist. Police arrived and arrested Bradley. She stated on cross-examination that she never saw Bradley with a gun.

The 16-year-old female testified that she was at the apartment when Bradley's girlfriend arrived, and the argument between Bradley and his girlfriend eventually moved outside where it escalated and became physical. She said there were two males who had been at the apartment, and after she saw Bradley slap his girlfriend, she went to get one of the males to stop Bradley from hitting his girlfriend. Bradley came around the corner of the building and asked one of the males, who had a gun in the waistband of his pants, to hand him the gun. Bradley took the gun and was "waiving it" at the roofers. The female remembered Bradley racking the slide of the gun one time while he was standing by his girlfriend's car. The 16-year-old testified that "[a]t some point," one of the males came and grabbed the gun and took off with it, "and then the police just so happen[ed] to show up, like, a minute later."

Nathaniel W., Lavon M., Ty S., and another worker were roofing a house across the alley from an apartment building when they noticed a woman and a man, later identified as Bradley, arguing outside of the apartment building. Nathaniel said he saw the couple arguing and "one thing kind of led to another, and [Bradley] started putting his hands on [the woman's] throat or her neck." Lavon testified that Bradley grabbed the woman by the shoulders and "slammed her against the car," and later grabbed her by the neck as she was "swinging on him." Lavon said the other roofers wanted to call the police, but Lavon did not want to. Instead he yelled out to Bradley something like, "Hey, cool out, chill out," though he did not recall the exact words he used.

According to Nathaniel, Bradley told the roofers "to mind [their] own business," and made a comment "about being in a gang, and then he [said] that he could kill all of us if he wanted to." Bradley went around the corner of the apartment building, out of Nathaniel's view, and returned approximately 30 seconds later with a gun. According to Nathaniel, Bradley racked the slide of the gun twice, ejecting a round each time, and told the roofers "'I only need one to kill you.'" Nathaniel testified that Bradley then walked backed to an alleyway where he could not see him, and Nathaniel told his boss to hide, saying, "he has a gun, man, . . . [H]ide, he has a gun." When Bradley came back from "around the corner," Nathaniel no longer saw the gun, and Bradley continued to argue with the female. Nathaniel and other workers went to the other side of the roof "to be on the safe side" because, "[w]ell, he pulled the gun." When asked if he thought he might get shot at, Nathaniel responded, "Yes."

Lavon testified that after he tried to get Bradley to calm down, Bradley said, "everybody in the mother fucking hood mind their own fucking business." Lavon told Bradley he did not think there were any hoods in Lincoln. Bradley "and his homies walked in the house and proceeded to come back with a .380 Hi-Point gun and proceeded to point it at us." Bradley "pointed the gun and racked it back," and said, "'It only takes one to kill you.'" Lavon said Bradley "pointed the handgun, cocked it back two times," and Lavon thought, "Oh, shit. He has a gun." Lavon explained that when you "rack the slide, you're basically putting a bullet in the chamber. You rack it once, you put a bullet in there. You rack it again, it ejects the bullet out beside the gun." Although Lavon

testified that Bradley "was just upset about the situation that happened," and "didn't want to cause me no physical harm," Lavon said one of the other workers was nervous and started crying.

Lavon, who was born and raised in Chicago, Illinois, said he was familiar with guns because he used to be an active gang member. He also testified that the gun Bradley used was a ".380 Hi-Point," which he knew because he had owned one previously. Lavon was shown a picture of a gun (exhibit 7), which he said was similar to the handgun that he saw Bradley holding. Lavon also testified about Bradley hitting the windshield of the girlfriend's car with the handgun.

Ty testified he saw Bradley with the female arguing in a parking lot. He was up higher on the roof than where Lavon was working. After another roofer said something, Ty turned around and saw Bradley with the female "in a choke hold up against the brick building." However, Ty did not watch "any more than 15 seconds," and turned around and started shingling again. He never saw Bradley with a gun, but he did hear a sound "like glass shattering."

One of the roofers called the owner of the roofing company to report what had happened. The owner then came over to their location and called the police. Police arrived and arrested Bradley, but they did not find a gun. After the officers left, the roofers located a bullet in the alley when they were cleaning up, and police returned and collected it.

The owner of the roofing company was not present during the confrontation between Bradley and the roofing crew; however, he testified that he received a call from one of his crew members who told him that they had been threatened with a gun, so he went to their location and called the police.

Another employee who "sell[s] roofs" for the company was with the owner when both he and the owner received a phone call that someone had pulled a gun on the crew. He and the owner arrived at the house where the roofers were working and called the police. After the police left, the employee left the job site to go to his van, retrieved his own gun "[f]or the safety of our employees," and then returned to the job site. He testified his gun was a "Ruger .380." Prior to leaving the alley for lunch, he was sweeping up the roofing debris in the alley and noticed a bullet ahead of where he was sweeping. He testified he did not move or touch the bullet, and called police after he located it. The employee testified that he uses a different type of bullet in his gun than the one located in the alley, and he responded affirmatively when asked if he was "a hundred percent positive" it was not his bullet.

John Brandl, a police officer with the Lincoln Police Department, arrived at the scene in response to a call for a "weapons violation in progress" and found Bradley and his girlfriend arguing. He took Bradley into custody, but could not locate a gun. He stated he could not search the area because there was no indication as to a starting point for a search, though the girlfriend's car was searched. They also searched the area for bullets, but could not locate any. Since it was "late fall," there were "a lot of leaves, debris, debris from the roofing folks," and they "[d]id not find a bullet at that time." Officer Brandl later returned to the alley and picked up the bullet located by the roofers and put it in a plastic evidence bag. He testified the bullet said "380" on it. Officer Brandl also explained that when "someone racks a slide of a .380," as the slide is drawn back, it "pulls a round from the magazine and puts it into the chamber of the weapon." If the weapon is fired, it ejects a spent shell out. If the slide is pulled back "with a live round in, it will eject the live round out and then insert another round from the magazine into a chamber." When Officer Brandl

was shown exhibit 7 and asked if it "look[ed] to be a .380-caliber," he responded, "It could be," but that he did not "see any specific markings on that particular one to show that it's a .380."

*(ii) Evidence Related to Witness Tampering Charge*

Bradley's girlfriend testified that she spoke with Bradley multiple times while he was in jail after his arrest; they were "still boyfriend and girlfriend" at that time. Recordings of two telephone calls were played in open court during her direct examination, and she testified she and Bradley were talking in third person to each other during those calls because she knew they "weren't supposed to have communication." The following colloquy regarding the first telephone call took place during the State's direct examination of the girlfriend:

Q. . . . Then there towards the end of the call, he says, "Hopefully, [girlfriend's name] doesn't show up to that," and he's talking about a prelim. Do you recall that part of the recording?

A. Yes.

Q. And he says, "Hopefully, [girlfriend's name]," but he's obviously still talking to you; correct?

A. Correct.

Q. So he's essentially telling you not to show up?

A. I mean, he wasn't telling me not to because --

Q. But he says, "Hopefully, [girlfriend's name] doesn't show up to that."

A. Meaning it was, like, my choice.

Q. And saying if she doesn't accept a subpoena or if she happens to not be there when it's served or if she gets served and doesn't show up, it would just be a little fine for [girlfriend's name]?

A. Correct.

The girlfriend was questioned similarly by the State during its direct examination regarding the second telephone conversation:

Q. And in that second call, the one from November 17th, Mr. Bradley says something. If [girlfriend's name] says I never touched her, then, essentially, it would be better for his case. Do you recall him saying that in the call?

A. Yeah.

Q. And he's talking to you; correct?

A. Correct.

Q. And you respond, "The only thing that kind of makes me nervous or worried is they took pictures of her, the marks on her face and neck." Do you recall talking about that?

A. Correct.

Q. And then you say you could play it off as nervousness or being nervous; right?

A. Correct.

On cross-examination, the girlfriend testified she did not feel intimidated to not show up in court, nor did she feel that Bradley was "begging" her not to show up.

### (b) Defense's Evidence

Bradley testified that on November 15, 2016, his girlfriend came over to the apartment where he was living and they began arguing around 3 a.m. The argument eventually moved outside at approximately 7:30-7:45 a.m., and there were roofers across the alley working. His girlfriend left, but then returned shortly thereafter. She began arguing with him again, pushing him, and was trying to hit him. Bradley put his hands on his girlfriend's shoulders to hold her back and push her away from him. He heard "somebody yell something" but he could not tell who it was. At that point his girlfriend slapped him and he grabbed her by the neck. He heard the yelling again and determined it was coming from the roofers. He let go of his girlfriend and began yelling at the roofers to mind their own business. He and the roofers began to yell back and forth, and eventually two of his friends came outside and were standing with him while he was arguing with the roofers. He stated that Lavon was antagonizing him, and in response he was "trying to get [Lavon] to come get off the ladder [he was on] so [they] could fight." He denied threatening Lavon with a gun. He stated that he stopped arguing with Lavon once Lavon refused to come down and he realized there was not going to be a fight. He was upset because "none of this should have happened" and he hit the windshield on his girlfriend's car. Bradley and his girlfriend then continued arguing outside of the apartment until the police arrived and took him into custody.

Regarding the telephone calls to his girlfriend while he was in jail, Bradley admitted to the two jail calls with his girlfriend, and acknowledged that they were talking in third person in case anyone was listening. However, Bradley denied trying to make his girlfriend avoid service of a subpoena. Bradley testified,

> No. I couldn't really directly talk to her about what was going on, and so I was just telling her, like, that if she doesn't go to court - I'm not telling her not to go to court, but I'm saying that if she doesn't go to court, my case will most likely get dropped and I'll get off, but I'm not telling her, "Don't go do it."

Bradley did acknowledge asking his girlfriend to go to the prosecutor's office "and tell them nothing happened."

Bradley's father also briefly testified, however, his testimony is not relevant to any of the issues presented on appeal.

The jury found Bradley guilty of possession of a firearm by a prohibited person, terroristic threats, use of a firearm to commit a felony, and tampering with a witness or informant. He was found not guilty of third degree domestic assault. He was sentenced on June 20, 2017, to consecutive sentences totaling 18 to 27 years' imprisonment. Bradley appeals.

### III. ASSIGNMENTS OF ERROR

Bradley assigns the court erred by (1) increasing his bond amount, (2) denying his motion to continue trial, (3) allowing the State to amend the information, (4) allowing the State to endorse additional witnesses, (5) overruling his evidentiary objections to Exhibit 7 (picture of gun), and

(6) allowing inadmissible hearsay evidence. Bradley also claims (7) the evidence was insufficient to convict him and (8) his sentences are excessive.

## IV. STANDARD OF REVIEW

A decision whether to grant a continuance in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Baxter*, 295 Neb. 496, 888 N.W.2d 726 (2017). A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *Id.*

The decision to grant or deny an amendment to a pleading rests in the discretion of the court. *State v. Banks*, 278 Neb. 342, 771 N.W.2d 75 (2009).

Whether to permit the names of additional witnesses to be endorsed upon an information after the information has been filed is within the discretion of the trial court. *State v. Sandoval*, 280 Neb. 309, 788 N.W.2d 172 (2010).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Hill*, 298 Neb. 675, 905 N.W.2d 668 (2018).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Cotton*, 299 Neb. 650, 910 N.W.2d 102 (2018). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018).

## V. ANALYSIS

### 1. EXCESSIVE BOND

As noted earlier, Bradley's bond was initially set as a $50,000 percentage bond, and then the day before trial was to commence, the State made an oral motion to increase Bradley's bond to a $100,000 percentage bond based on the additional charges and its assertions that several of its witnesses had reported being threatened regarding their involvement in the case. The State's motion was granted. Bradley assigns the court erred by increasing his bond amount. He argues he is "entitled to a reasonable bond or, in other words, not an excessive bond." Brief for appellant at 16. He points out that during prior bond reduction hearings, the court had found "the original bond amount was reasonable," and "[i]t wasn't until Bradley raised enough money to post the original

amount of bond that the State, in what seems like a panic, asked to increase Bradley's bond." *Id.* at 17. He concludes that "[t]he only way that it can be interpreted is the State never thought Bradley would be able to post bond and when he did, the State increased his bond so that he would never gain release," and that "[u]nless the right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." *Id.*

While Bradley's assignment of error states that the court abused its discretion by increasing his bond amount, his arguments, including his entitlement to "a reasonable bond," amount to an argument that his bail was excessive. And, the issue of excessiveness of pretrial bail is not reviewable after a conviction and sentence. *State v. Harig*, 192 Neb. 49, 218 N.W.2d 884 (1974). The appropriate form of relief from a denial of a motion to reduce bail claimed to be excessive is by habeas corpus. *Id*. The alleged excessiveness of Bradley's pretrial bail became irrelevant upon his convictions and sentences; therefore, as stated in *State v. Harig, supra*, the issue is no longer reviewable.

2. DENIAL OF MOTION TO CONTINUE TRIAL

Bradley claims the district court erred by denying his motion to continue the trial so he could depose his girlfriend. He argues that a continuance would not have prejudiced the State and that "[c]ourts cannot require defense counsel to take 11th hour depositions." Brief for appellant at 19. He asserts that the result of the court's failure to grant the continuance was "to force Bradley to go to trial without being able to investigate the contradictory statement made by the alleged victim/witness." *Id.*

The motion to continue the trial was made orally at a hearing on May 2, 2017, the day prior to the commencement of trial on May 3. Bradley's counsel wanted to depose Bradley's girlfriend because counsel had recently noticed in a video that the girlfriend made comments that contradicted her statements about never seeing a gun. Defense counsel said it was hard to understand the girlfriend in the video because she was crying. Defense counsel indicated that he had not previously deposed the girlfriend because he did not think he needed to; he admitted, however, that he had not played the video "the whole way through" until the day before the hearing on his motion to continue.

The court gave Bradley leave to depose the girlfriend until she was ordered to appear the next day, May 3, 2017, at 1:30 p.m., and denied the motion to continue. On May 3, upon inquiry from the court, Bradley's counsel informed the court he decided to not depose the girlfriend, but he had spoken to her on the telephone and was able to "ask the questions he wanted to ask."

Notably, the girlfriend testified that she never saw Bradley with a gun. As the State points out, since the girlfriend testified that Bradley did not have a gun (which was consistent with her initial statement to the police), and the State never asked the girlfriend if she saw Bradley with a gun, there was no prejudice to Bradley by not being allowed to continue the trial until he could depose the girlfriend to further explore a possible inconsistent statement about the gun.

We agree with the State. Bradley does not claim he was denied timely access to the video. Further, Bradley's inability to depose the girlfriend about possible contradictory statements on whether she saw Bradley with a gun was not prejudicial to Bradley's defense because the girlfriend testified that she did not see Bradley with a gun. The State did not attempt to impeach the girlfriend

with any statements made on the video. The district court did not abuse its discretion by denying Bradley's motion to continue trial.

## 3. AMENDING INFORMATION

Bradley did not object to the State filing an amended information on January 9, 2017. However, when the State sought to file a second amended information on February 23, in which the State added the use of a deadly weapon to commit a felony charge, Bradley objected. Defense counsel argued, "It's just a form of punishment because [Bradley] wouldn't take a plea offer." Defense counsel acknowledged being "informed a long time ago about this, at least when the plea offer was made, that this would be an added charge; so no surprise." The district court, noting this was not a surprise and that no valid reason or objection was given, granted the State leave to amend. As a result, Bradley claims on appeal that he was prejudiced and denied a fair trial because the "the court's ruling placed him in a difficult position, defending on the run." Brief for appellant at 21. He claims this was an abuse of discretion.

The State correctly points out that objections to the form or content of an information should be raised by a motion to quash. *State v. Johnson*, 290 Neb. 369, 859 N.W.2d 877 (2015). Failure to file a motion to quash waives any argument that a court erred in allowing the State to amend the information against the defendant. See *State v. Collins*, 281 Neb. 927, 799 N.W.2d 693 (2011). Bradley does not direct us to such a motion to quash, nor do we see such a motion in the record before us. Accordingly, Bradley has waived this argument. However, even if he had not waived it, Bradley would not be able to show any prejudice by the addition of this charge since it was acknowledged at the February 23, 2017, hearing that the amendment was "no surprise" and trial did not start until May 3. See *State v. Collins, supra* (no abuse of discretion when information amended just 20 days before trial). The district court did not abuse its discretion by allowing the State to file the second amended information.

## 4. ENDORSEMENT OF ADDITIONAL WITNESSES

At a hearing held April 19, 2017, the State requested a hearing on a motion to endorse additional witnesses; defense counsel acknowledged receiving an email as to who the State was adding. A motion listing three additional witnesses was filed the next day. At the April 26 hearing on the State's motion, defense counsel objected to the additional witnesses "because of the late hour that this notice has come out." Defense counsel added, "But, to be perfectly honest with the Court, these are all people that were mentioned in the report. I was aware of each one of them; so it's not like it's a new witness that I never heard of before." The court sustained the State's motion. Bradley now argues the court erred by granting the State's motion "on practically the eve of trial," and "[t]here was no time for Bradley to account for those changes in his trial strategy." Brief for appellant at 21.

Nebraska law requires a prosecuting attorney to endorse the names of known witnesses at the time the information is filed. *State v. Sandoval*, 280 Neb. 309, 788 N.W.2d 172 (2010); see, also, Neb. Rev. Stat. § 29-1602 (Reissue 2016). The purpose of this requirement is to give the defendant notice as to witnesses who may testify against him or her and give the defendant an opportunity to investigate them. *State v. Sandoval, supra.* However, a trial court may allow

witnesses to be endorsed after an information is filed when doing so does not prejudice the defendant in the preparation of his or her defense. *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006).

Bradley cannot show he was prejudiced by the court's decision; he admitted at the hearing that he was aware of each one of the added witnesses. Additionally, two of the three witnesses did not testify. The witness who did testify was one of the roofers (Ty), and he only offered evidence cumulative to several others regarding seeing Bradley and his girlfriend arguing. And Ty testified he never saw a gun. It is difficult to fathom how the late endorsement of this witness was prejudicial to Bradley. The district court did not abuse its discretion in permitting the prosecution to endorse the three additional witnesses.

### 5. EXHIBIT 7

When conducting its direct examination of Lavon, the State offered exhibit 7, a picture of a handgun purportedly similar to the one Lavon saw Bradley holding on the day of the incident. The State asked, "Obviously not the actual gun [Bradley] had, but otherwise similar in look and make and model?" Lavon replied, "Yes." Defense counsel objected "on foundation, 403, and confrontation," but clarified that his objection was on "foundation and 403 and that it's prejudicial." The State responded it was "offering it for demonstrative evidence. . . . [I]t's not the actual weapon. . . . [I]t would just help the jurors picture what exactly we're talking about." The court concluded the picture did not lack foundation and was not prejudicial, and the objection was overruled. The State then inquired, "[Lavon], Exhibit 7, you said, is similar to the gun you saw Mr. Bradley with and the make and model. Obviously, it's not the exact gun; correct?" Lavon replied, "Yes." The court then added, "And, . . . for the record, 7 was received for demonstrative purposes."

Bradley contends the court erred by admitting exhibit 7 over his objection that it lacked foundation and was unfairly prejudicial. Further, he argues that although the picture was offered as demonstrative evidence only, such evidence must still have foundation, be relevant, and not be prejudicial.

Bradley claims the picture lacked foundation because there was no "evidence of the source of the picture" or "evidence of how the exhibit was created or the person who created the exhibit testifying that [it] was a copy of a .380 handgun and where it came from." Brief for appellant at 22, 23. The State asserts, however, that Lavon testified he was familiar with guns because he used to be "an active gang member" and used to own guns. Also, Lavon used to own a ".380 Hi-Point," so he knew "exactly what it looked like" and was immediately able to recognize such a gun. Lavon's testimony sufficiently laid foundation as to the picture being representative of a .380 handgun.

Bradley also argues the picture was not relevant because "[e]veryone knows what a handgun looks like so the picture did not aid the jury about what the witness was explaining" and that the type of gun used was not part of the State's burden of proof. *Id.* at 24. He contends, "The picture of a handgun did nothing to help aid or assist the jury in understanding the evidence or issues in [the] case."*Id.* at 24-25. He further contends that because the State did not have "possession of the handgun that the witnesses claimed to have seen used by Bradley," *id.* at 24,

the picture of a handgun was "a thinly veiled attempt to show the jury a gun and place it in the hands of Bradley," *id.* at 25.

The State contends exhibit 7 was relevant and not unfairly prejudicial because "[a] key witness . . . testified that he saw Bradley with a Hi Point .380 handgun, and he recognized the gun because he owned the exact same one." Brief for appellee at 15. The State also asserts, "[Lavon's] specific testimony of the make of the handgun made it beneficial to show the jury what a Hi Point .380 handgun looks like." *Id.*

To be relevant, evidence must be probative and material. *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018). Evidence is probative if it has any tendency to make the existence of a fact more or less probable than it would be without the evidence. *Id.* A fact is material if it is of consequence to the determination of the case. *Id.* Relevancy requires only that the degree of probativeness be something more than nothing. *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015).

We agree with Bradley that offering a picture of a gun that looked similar to the one Lavon claimed to see Bradley holding on the day of the incident was not necessary to make it more probable that Bradley was in possession of a firearm. However, the State did not offer the picture as substantive evidence; rather, it was offered as demonstrative evidence. Therefore, we consider whether exhibit 7 was relevant in that context. With regard to demonstrative exhibits, the Nebraska Supreme Court has stated:

> Demonstrative exhibits are broadly defined as aids "offered to illustrate or explain the testimony of witnesses, including experts, or to present a summary or chronology of complex or voluminous documents." Our case law specifically defines demonstrative exhibits as those that "clarify some issue in the case." As these definitions highlight, demonstrative exhibits are defined by the purpose for which they are offered at trial--to aid or assist the jury in understanding the evidence or issues in a case. "They are relevant . . . only because of the assistance they give to the trier in understanding other real, testimonial and documentary evidence." Thus, even though demonstrative exhibits may be "admitted" into evidence during the course of the trial, they serve a purpose distinct from other exhibits admitted for substantive and not merely demonstrative purposes.

*State v. Pangborn*, 286 Neb. 363, 370-71, 836 N.W.2d 790, 797-98 (2013). Significantly, "exhibits admitted only for demonstrative purposes do not constitute substantive evidence." *Id*. at 371, 836 N.W.2d at 798. Therefore,

> If used improperly, demonstrative exhibits can distract the jury from considering all of the evidence presented, causing them instead to unfairly emphasize only portions of the evidence. . . . [D]emonstrative exhibits can be tempting vehicles for conveying prejudicial language and assumptions or inadmissible evidence to the jury.
>
> Furthermore, if not instructed on the limited purposes of demonstrative exhibits, the jury may assume that demonstrative exhibits constitute primary proof of the information contained therein, leading the jury to shirk its duty to determine the truth and accuracy of the evidence. The jury may attribute undue weight or credibility to evidence

summarized or illustrated in demonstrative exhibits. . . . [D]emonstrative exhibits that are not properly explained may ultimately confuse or mislead the jury.

*Id*. at 377-78, 836 N.W.2d at 802-03.

The State properly explained through its questioning of Lavon that the picture was not depicting the "exact gun," and the district court specifically informed the jury that it was admitting exhibit 7 for demonstrative purposes. Although these cautionary steps were taken, we nevertheless conclude that a picture of a gun which Lavon identified as being similar to the one Bradley was holding did not serve to assist the trier of fact in understanding testimony or clarifying any issue in this case. The specific make and model of the gun is not an element of any of the crimes for which Bradley was convicted (discussed further below). The type of gun was only relevant to connect the bullet found at the scene to the testimony of several witnesses who said that Bradley racked the slide of the gun, thus ejecting a bullet. However seeing a picture of a gun purported to look like the gun Bradley was holding was unnecessary to assist the jurors in considering the relevance of that evidence. Further, when Officer Brandl was shown exhibit 7 and was asked if it "look[ed] to be a .380-caliber," he responded, "[i]t could be," but that he did not "see any specific markings on that particular one to show that it's a .380."

Since demonstrative exhibits are relevant "'only because of the assistance they give to the trier in understanding other real, testimonial and documentary evidence,'" we find the court abused its discretion by admitting the picture as a demonstrative exhibit. *Pangborn*, 265 Neb. at 370, 836 N.W.2d at 798.

However, we also find that any error in admitting exhibit 7 over Bradley's objection was harmless. Errors, other than structural errors, which occur within the trial and sentencing process, are subject to harmless error review. *State v. Pangborn, supra*. Harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant. *Id*. In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *Id*. Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *Id*.

When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case. *State v. Kidder*, 299 Neb. 232, 908 N.W.2d 1 (2018). An appellate court looks to the entire record and views the erroneously admitted evidence relative to the rest of the untainted, relevant evidence of guilt. *Id*. An additional consideration is whether the improperly admitted evidence was cumulative and tended to prove the same point as other properly admitted evidence. *Id*.

When viewing the erroneously admitted picture of a gun relative to the rest of the untainted, relevant evidence of guilt, we cannot say the admission of this exhibit influenced the outcome of the case. Specifically, several witnesses testified that Bradley pointed a gun at the roofers. Two of

those witnesses, Lavon and Nathaniel, testified about Bradley racking the slide of the gun twice, and pointing the gun at them and making threats. The 16-year-old female witnessed Bradley asking for the gun from one of the other males present who had a gun in the waistband of his pants. She testified that Bradley took the gun and was "waiving it" at the roofers. The female also remembered Bradley racking the slide of the gun, and that at some point just before the police arrived, one of the other males grabbed the gun and took off with it. Accordingly, although it was error to receive exhibit 7 as a demonstrative exhibit, we cannot say it materially influenced the jury in reaching a verdict. The considerable other untainted and substantive evidence relevant to Bradley's possession of a gun establishes that the actual guilty verdicts rendered by the jury were surely unattributable to this particular exhibit. Thus, the error does not justify reversing Bradley's convictions.

### 6. OBJECTION TO ROOFING COMPANY OWNER'S TESTIMONY

Bradley contends the court erred by overruling his hearsay objection during the roofing company owner's testimony. The testimony in question was elicited by the State in its direct examination of the owner:

> [The State]: Why do you call the police when you get there?
> [Witness]: 'Cause I was called and told that there was a gun and the guy that was --
> [Defense Counsel]: Objection, hearsay, move to strike[.]
> THE COURT: What's it being offered for?
> [The State]: Why he called police and why he's the one who called police.
> THE COURT: Overruled. He may answer.
> [The State]: You can continue with your answer, sir.
> [Witness]: I was called by an employee telling me that there was an argument and a guy hit a girl and that there was a gun pulled; so I called the cops, and I showed up and waited for the cops.

Bradley argues the testimony is hearsay and does not fall under any exception to Neb. Rev. Stat. § 27-801 (Reissue 2016). He claims the testimony was a "thinly veiled attempt at proving up the existence of the gun." Brief for appellant at 27. He asserts that the testimony "was being offered for the truth of the matter" and that "[t]he reason [the owner] was there or that he called the police is irrelevant to the matters before the jury." *Id.*

The State asserts that the testimony in question was not hearsay, as it was not offered for "the truth of the matter asserted, but rather to explain why [the owner] called police." Brief for appellee at 17. We agree. Further, as the State also notes, even if the owner's statement that his employee told him "there was a gun pulled" was hearsay, it was cumulative to the testimony of witnesses who testified to seeing Bradley with a gun, and was therefore harmless. As we noted above, when determining whether an alleged error is so prejudicial as to justify reversal, we consider whether the error, in light of the totality of the record, influenced the outcome of the case. *State v. Kidder, supra*. In doing so, we can consider whether the improperly admitted evidence was cumulative and tended to prove the same point as other properly admitted evidence. See *id*. The owner's testimony that an employee told him "there was a gun pulled" would not have

influenced the outcome of the case given that three other witnesses testified to actually seeing Bradley with a gun.

### 7. SUFFICIENCY OF EVIDENCE

Bradley argues there was insufficient evidence to support his convictions. He was convicted of possession of a deadly weapon by a prohibited person under Neb. Rev. Stat. § 28-1206(1)(a) (Reissue 2016), terroristic threats under Neb. Rev. Stat. § 28-311.01 (Reissue 2016), use of a deadly weapon to commit a felony under Neb. Rev. Stat. § 28-1205(1) (Reissue 2016), and tampering with a witness or informant under Neb. Rev. Stat. § 28-919 (Reissue 2016).

Whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Cotton*, 299 Neb. 650, 910 N.W.2d 102 (2018). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

#### (a) Possession of Deadly Weapon by Prohibited Person

A person commits the offense of possession of a deadly weapon by a prohibited person if he or she "[p]ossesses a firearm," and "[h]as previously been convicted of a felony." § 28-1206(1)(a). The parties stipulated that Bradley had previously been convicted of a felony. Therefore, Bradley's argument focuses on the evidence related to him being in possession of a firearm. Bradley points out that a gun was never recovered by the police, there was conflicting testimony as to where the bullet was found, the bullet was of the same caliber as a gun carried by one of the roofers, and there was competing testimony as to whether Bradley ever possessed a gun at all.

Three different witnesses, Nathaniel, Lavon, and the 16-year-old female, each testified to seeing Bradley with a gun, and both Nathaniel and Lavon testified as to the specific type of gun Bradley was holding. The 16-year-old witnessed Bradley requesting the gun from another male present at the scene who had the gun in the waistband of his pants. Therefore, viewing the evidence in the light most favorable to the prosecution, we find a rational trier of fact could have found the essential elements of possession of a deadly weapon by a prohibited person beyond a reasonable doubt.

#### (b) Terroristic Threats

Under § 28-311.01(1), "[a] person commits terroristic threats if he or she threatens to commit any crime of violence . . . [w]ith the intent to terrorize another." Nathaniel, Lavon, the girlfriend, and Bradley himself testified at trial that Bradley was upset at the intervention by the roofers and told them to mind their own business when he was arguing with his girlfriend. Nathaniel, Lavon, and the 16-year-old female each testified that Bradley pointed a gun at the roofers and "racked" the slide of the handgun at least once, ejecting a bullet. According to Officer Brandl, when "someone racks a slide of a .380," it "pulls a round from the magazine and puts it into the chamber of the weapon." If the weapon is fired, it ejects a spent shell out. If the slide is

pulled back "with a live round in, it will eject the live round out and then insert another round from the magazine into a chamber." This demonstrated the gun was loaded. Nathaniel testified Bradley told them "I only need one to kill you," and Lavon testified similarly that Bradley stated, "It only takes one to kill you," after ejecting a bullet. Nathaniel and other workers went to the other side of the roof "to be on the safe side" because "[w]ell, he pulled the gun." When asked if he thought he might get shot at, Nathaniel responded, "Yes."

A fact finder could have found that Bradley's actions and statements to the roofers were a threat to commit a crime of violence and were intended to terrorize them. Therefore, a rational trier of fact could have found each of the elements of terroristic threats was met beyond a reasonable doubt.

### (c) Use of Deadly Weapon to Commit Felony

The facts supporting Bradley's conviction for terroristic threats are also relevant to his conviction for use of a deadly weapon to commit a felony. Under § 28-1205(1)(a), "[a]ny person who uses a firearm . . . to commit any felony which may be prosecuted in a court of this state commits the offense of use of a deadly weapon to commit a felony." As noted above, Nathaniel and Lavon both testified that Bradley used a gun while threatening a crime of violence, specifically in this case, terroristic threats, which is a Class IIIA felony. See § 28-311.01(2). Therefore, a rational trier of fact could have found that Bradley used a firearm to commit a felony, thereby establishing the essential elements of § 28-1205 beyond a reasonable doubt.

### (d) Tampering With Witness

Bradley contends that because the alleged victim of the charged domestic assault was his girlfriend and he was found not guilty of the domestic assault, "it makes no logical sense he could then tamper with [the girlfriend] for a crime he was acquitted of." Brief for appellant at 28. However, tampering with a witness does not require a successful conviction. Pursuant to § 28-919:

(1) A person commits the offense of tampering with a witness or informant if, believing that an official proceeding or investigation of a criminal or civil matter is pending or about to be instituted, he or she attempts to induce or otherwise cause a witness or informant to:

(a) Testify or inform falsely;

(b) Withhold any testimony, information, document, or thing;

(c) Elude legal process summoning him or her to testify or supply evidence; or

(d) Absent himself or herself from any proceeding or investigation to which he or she has been legally summoned.

Bradley's girlfriend's testimony, summarized previously, demonstrates that during telephone calls between the girlfriend and Bradley while Bradley was in jail, Bradley made several statements to his girlfriend about avoiding service of a subpoena, failing to appear for proceedings, and denying that Bradley had ever "touched her." During his testimony, Bradley denied he was trying to influence his girlfriend during the telephone conversations, but he did admit that he asked her to go to the prosecutor's office "and tell them nothing happened."

Bradley was arrested and taken to jail on November 15, 2016. The telephone calls, recordings of which were entered into evidence, took place on November 16 and 17. Bradley would have been aware "that an official proceeding or investigation of a criminal . . . matter [was] pending or about to be instituted" when the telephone conversations took place with his girlfriend. A rational fact finder could have found that the essential elements of § 28-919 were met beyond a reasonable doubt.

## 8. EXCESSIVE SENTENCES

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018).

Bradley assigns the court erred by sentencing him to a total of 18 to 27 years' imprisonment instead of probation or a lesser term of incarceration. We first set forth the statutory limits for each conviction and then consider whether the totality of the sentences imposed was an abuse of discretion based on the record before us and the sentencing factors to be considered by the district court.

### (a) Statutory Ranges for Each Conviction

Possession of a deadly weapon by a prohibited person is a Class ID felony for a first offense. See § 28-1206(3)(b). A Class ID felony is punishable by a mandatory minimum of 3 years' imprisonment up to a maximum of 50 years' imprisonment. See Neb. Rev. Stat. § 28-105(1) (Reissue 2016). Bradley was sentenced to 5 to 7 years' imprisonment; this sentence is within the statutory range. Also, a person convicted of a felony for which a mandatory minimum sentence is prescribed shall not be eligible for probation. § 28-105(4).

Terroristic threats is a Class IIIA felony. See § 28-311.01(2). A Class IIIA felony is punishable by 0 to 3 years' imprisonment and up to 18 months' postrelease supervision, or a $10,000 fine, or both. A minimum of 9 months' postrelease supervision is required if imprisonment is imposed. See § 28-105. Neb. Rev. Stat. § 29-2204.02(1)(a) (Reissue 2016) requires a determinate sentence of imprisonment for a Class IIIA felony. However, § 29-2204.02(4) requires an indeterminate sentence "[f]or any sentence of imprisonment for a Class III, IIIA, or IV felony for an offense committed on or after August 30, 2015, imposed consecutively or concurrently with . . . (b) a sentence of imprisonment for a Class I, IA, IB, IC, ID, II, or IIA felony." Since Bradley's prison sentence on his Class IIIA felony was to be served consecutively to his prison sentences on his Class IC and ID felonies, an indeterminate sentence was required. Bradley was given an indeterminate sentence of 3 to 3 years' imprisonment for this Class IIIA felony. See *State v. Vanness*, 300 Neb. 159, 169, 912 N.W.2d 736, 746 (2018) ("a determinate sentence is a single term of years and an indeterminate sentence is a minimum term and maximum term or a range of time for which a defendant is to be incarcerated, even if the minimum and maximum number are the same"). And although ordinarily § 29-2204.02(1)(b) requires the imposition of postrelease supervision, no postrelease supervision was ordered in this case because any person who is sentenced to imprisonment for a Class ID felony and sentenced concurrently or consecutively to

imprisonment for a Class IIIA felony, "shall not be subject to post-release supervision." § 28-105(6). Bradley's sentence for this conviction was within the statutory range for a Class IIIA felony.

Tampering with a witness is a Class IV felony. See § 28-919(3). A Class IV felony is punishable by 0 to 2 years' imprisonment and 12 months' postrelease supervision, or a $10,000 fine, or both. A minimum of 9 months' postrelease supervision is required if imprisonment is imposed. See § 28-105. Section 29-2204.02(1)(a) requires a determinate sentence of imprisonment for a Class IV felony, unless probation is otherwise required pursuant to § 29-2204.02(2). However, probation was not required here because Bradley was being sentenced to imprisonment for other felonies. See § 29-2204.02(2)(a). Additionally, as noted above, § 29-2204.02(4) requires an indeterminate sentence for any sentence of imprisonment for a Class IV felony for an offense committed on or after August 30, 2015, imposed consecutively or concurrently with a sentence of imprisonment for a Class IC or ID felony. Bradley was given an indeterminate sentence of 2 to 2 years' imprisonment for this Class IV felony. Again, no postrelease supervision was required for this Class IV felony since Bradley was subject to a separate sentence for a Class ID felony. See § 28-105(6).

Use of a deadly weapon to commit a felony is a Class 1C felony. See § 28-1205(1)(c). A Class IC felony is punishable by a mandatory minimum of 5 years' imprisonment up to a maximum of 50 years' imprisonment. See § 28-105(a). Also, the crimes defined in § 28-1205 "shall be treated as separate and distinct offenses from the felony being committed," and sentences imposed "shall be consecutive to any other sentence imposed." § 28-1205(3). Bradley was sentenced to 8 to 15 years' imprisonment.

Bradley's sentences were within the statutory limits for each conviction. The district court ordered all sentences to run consecutively to each other and to any other sentence Bradley was currently serving; credit was given for 217 days served.

(b) Sentences Not Abuse of Discretion

When imposing a sentence, the sentencing court is to consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *State v. Vanness*, 300 Neb. 159, 912 N.W.2d 736 (2018). Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. *Id.* This is so even when offenses carry a mandatory minimum sentence, unless the statute requires that consecutive sentences be imposed. *Id.*

The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Thieszen*, 300 Neb. 112, 912 N.W.2d 696 (2018).

Bradley's presentence investigation (PSI) included a Level of Service/Case Management Inventory (LS/CMI) to "determine the degree of risk that [he] presents to the community and risk to recidivate." The PSI reveals Bradley has a high school education and was employed doing odd

jobs in the fall of 2016, and he does not appear to have any major drug or alcohol issues. Bradley had a number of charges filed against him as a juvenile from 2011 to 2013 (terroristic threats, theft, disturbing the peace, trespass, third degree assault), with dispositions involving probation, intensive supervised probation, and placement at the youth facility in Kearney, Nebraska. As an adult, he has been convicted of terroristic threats (2015, 15-30 months' jail), disturbing the peace (2015, fine), and two convictions each for possession of marijuana and possession of drug paraphernalia (2016, fines). The PSI indicates Bradley's "overall criminal history reflects a poor or indifferent attitude towards laws and authority figures." Also, Bradley "has had major misconduct reports during his stay at jail," and he was "involved in fights when he was at the Youth Correctional Facility." Bradley scored overall as a "high risk" to reoffend on the LS/CMI.

At the sentencing hearing, Bradley's counsel acknowledged probation was not an option because of the nature of the offenses, but pointed out that Bradley responded well to supervision as a juvenile. Defense counsel also asked the court to consider that Bradley "has a family that cares for him," and that Bradley has an infant daughter. Bradley personally told the court that he "was very honest" when he testified, and "even though it didn't come out in [his] favor at the end of the day," he had "owned up to what [he] did and what [he] did wrong." Bradley said that he has tried to correct his behaviors and that he is not a threat to the community. Bradley stated, "I don't go out anymore and look to hurt nobody. That's not how I was raised, and that's not who I am."

The State expressed concern for the safety of the community and the witnesses in the case. Law enforcement had been monitoring Bradley's communications and it appeared Bradley was "still trying to influence witnesses in this case, despite being convicted of witness tampering." The State also pointed out that Bradley's prior felony conviction for robbery involved pointing a gun at someone. And in this case, "he not only possessed a firearm, but he used the firearm to threaten and terrorize innocent bystanders who were merely concerned about the safety of [Bradley's] girlfriend."

The court noted Bradley's past criminal history, dating back to when Bradley was 14 years of age. The court stated that Bradley had an "assaultive and violent nature" and that "[e]xtensive amounts of resources have already been applied to [him] and [his] situation, apparently to no avail, at least to this point." The court noted that "it's true this is not the way you were raised" and that "[m]aybe it was the people [Bradley] decided to associate [himself] with in the beginning." However, the court took into consideration the serious nature and violence associated with his convictions, and stated that it could not "ignore the serious threat to the community that [Bradley] present[s]."

Bradley argues on appeal that the court "failed to consider the mitigating criteria that were apparent from the record and the Presentence Investigation Report." Brief for appellant at 29. He argues the court "failed to take into account that his youth may have been a cause for rash decision making and motivation for these offenses" and that he had "the support of his family to assist him with whatever sentence he was given." *Id.* at 33. He also asserts his juvenile probation reports show that Bradley "responded well to probation supervision" and that the court should have considered the effect the sentence will have on Bradley's daughter. *Id.*

We find nothing in the record to indicate the court failed to consider any mitigating criteria. Upon our review of the record and consideration of the relevant sentencing factors as applied to Bradley, we cannot say the district court abused its discretion in the sentences ordered.

## VI. CONCLUSION

For the reasons set forth above, we affirm Bradley's convictions and sentences.

AFFIRMED.