Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/01/2018 09:08 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
MATTHEW J. KIDDER, APPELLANT.
___ N.W.2d ___

Filed March 9, 2018.    No. S-16-1124.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Rules of Evidence: Other Acts: Appeal and Error.** It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2016), and the trial court's decision will not be reversed absent an abuse of discretion.

3. **Criminal Law: Convictions: Appeal and Error.** In criminal cases, the purpose of harmless error review is to ensure convictions are not set aside for small errors or defects that have little, if any, likelihood of having changed the result of the trial.

4. **Criminal Law: Appeal and Error.** Harmless error jurisprudence recognizes that not all trial errors, even those of constitutional magnitude, entitle a criminal defendant to the reversal of an adverse trial result.

5. **Convictions: Appeal and Error.** It is only prejudicial error, that is, error which cannot be said to be harmless beyond a reasonable doubt, which requires that a conviction be set aside.

6. **Appeal and Error.** When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case.

7. **Verdicts: Juries: Appeal and Error.** Harmless error review looks to the basis on which the jury actually rested its verdict. The inquiry is

not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.

8. **Trial: Evidence: Appeal and Error.** In conducting harmless error analysis an appellate court looks to the entire record and views the erroneously admitted evidence relative to the rest of the untainted, relevant evidence of guilt.

9. **Verdicts: Evidence: Appeal and Error.** Overwhelming evidence of guilt can be considered in determining whether the verdict rendered was surely unattributable to the error, but overwhelming evidence of guilt is not alone sufficient to find the erroneous admission of evidence harmless.

10. **Evidence: Appeal and Error.** When conducting harmless error review, an appellate court may consider whether the improperly admitted evidence was cumulative and tended to prove the same point as other properly admitted evidence.

11. **Appeal and Error.** Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.

12. **Sentences.** A sentence validly imposed takes effect from the time it is pronounced, and any subsequent sentence fixing a different term is a nullity.

13. ____. Any attempt to modify a sentence validly imposed is of no effect, and the original sentence remains in force.

Appeal from the District Court for Douglas County: Kimberly Miller Pankonin, Judge. Affirmed in part, and in part vacated and remanded with directions.

Thomas C. Riley, Douglas County Public Defender, L. Robert Marcuzzo, Douglas A. Johnson, and Natalie M. Andrews for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

STACY, J.

Matthew J. Kidder appeals his convictions for first degree murder and use of a deadly weapon to commit a felony. We affirm his convictions, but find plain error in the sentence imposed on the conviction for use of a deadly weapon to commit a felony. We therefore vacate that sentence only and remand the cause with directions.

## FACTS

On June 25, 2015, Jessica Nelson's mother received a telephone call advising that Nelson had not shown up for work. Her mother went to Nelson's house to check on her and discovered Nelson's body partially submerged in the bathtub, unclothed, with the water running. She was curled up in a fetal position, and one hand was clutching a cell phone charging cord. Nelson's clothes were piled in the tub near her feet. Blood was pooled under Nelson's head, and there was a ligature mark on her neck.

Police officers arrived and processed the scene as a homicide. Investigators found no point of forced entry into the home. They took photographs and collected Nelson's cell phone, the charging cord, and the clothes from the bathtub. Blood was found outside the bathroom, in the living room, and in Nelson's bedroom. Swabs were taken of the cell phone cord and the various biological substances found throughout the house. Investigators noticed Nelson's right thumbnail was bent back, so they also swabbed under her fingernails and took fingernail clippings.

An autopsy revealed bruises and abrasions on Nelson's neck, hemorrhaging in her eyes, and a ligature mark on her neck that was consistent with the cell phone cord. The cause of death was strangulation. There was also evidence Nelson had been sexually assaulted. She had a laceration and bruising in her vaginal area, as well as contusions to her head, abdomen, and bowel.

Text Messages From Kidder

Nelson's cell phone was analyzed, and detectives found what they described as "eerie" text message conversations with a telephone number later confirmed to belong to Kidder. Nelson and Kidder had known each other since childhood.

The text conversation began on February 4, 2015. The first message arranged for Kidder to shovel snow from Nelson's driveway. For the next several months, Kidder texted Nelson, often suggesting they meet up. Typically, Nelson either turned Kidder down or did not respond.

On April 16, 2015, Kidder texted saying he needed some-place to "h[a]ng out" while he waited to run an early morn-ing errand, and he asked if he could stop at Nelson's house. Nelson agreed, but stated she would likely still be asleep and would leave the door unlocked. She told Kidder he could watch television, nap on the couch, or use the chairs outside while he waited. Later, the following text conversa-tion occurred:

> [Kidder:] Ill admit, a little part of me wanted to run in and doggy pile you, but i didnt feel like being stabbed or beat up. Lol.
>
> [Nelson:] Lol yeah that def would've happened. Im a grouch when my sleep is interrupted unless you're [my son], then I'm less grouchy lol[.]
>
> [Kidder:] Lol.
> Maybe next time.
> [Nelson:] If you want to die.
> I do keep a good sized knife in my nightstand drawer.
> [Kidder:] Challenge accepted.
> . . . .
> We will need to lay down some ground rules though. No hair pulling, no biting. Lol.
>
> [Nelson:] Or you could just leave me alone when I'm sleeping. Save us all the hassle[.]

Kidder continued to text Nelson regularly, and some of Kidder's messages were sexual in nature. On June 19, a few

days before the murder, Kidder sent Nelson the following sequence of text messages:

> [Kidder:] Scale of feeling playful stabby to murdered on my sleep.
>
> Yeah. Trying to make a joke, and now shes mad at me. Lol.
>
> In*
>
> I figured itd be a funny "breaking the ice" joke since every other guy sends dick pics for their first or all communication and im the one who asked off
>
> the wall questions.

Nelson did not respond to these text messages; nor did she respond to the text message Kidder sent several days later, on the evening of June 24, asking, "Who's down to hang out or catch a movie saturday night?"

### DNA EVIDENCE

Forensic analysts found two DNA profiles on the cell phone cord collected from the crime scene. Nelson could not be excluded as one of the contributors, and Kidder could not be excluded as the other contributor. The probability of someone other than Nelson and Kidder being the contributors of the DNA profiles on the cell phone cord was 1 in 254 million for Caucasians, 1 in 14.3 billion for African Americans, and 1 in 1.68 billion for American Hispanics.

The swab taken from under the fingernails on Nelson's left hand revealed similar results: Two profiles were present, Nelson could not be excluded as the contributor for one, and Kidder could not be excluded as the contributor for the other. The probability of someone other than Nelson and Kidder being the contributors to the DNA found under Nelson's left fingernail was 1 in 101 million for Caucasians, 1 in 10.6 billion for African Americans, and 1 in 936 million for American Hispanics.

A mixture of DNA was found under Nelson's right thumbnail, which was bent back. Nelson could not be excluded

as the major contributor, and Kidder could not be excluded as the minor contributor. The probability of someone other than Kidder being the minor contributor was 1 in 1,550 for Caucasians, 1 in 33,330 for African Americans, and 1 in 5,800 for American Hispanics. The analyst testified that the lower probabilities were a function of the fact that only a partial DNA profile was developed.

## HISTORICAL CELL SITE
## LOCATION INFORMATION

Detectives obtained Kidder's cell phone records from his service provider. Using historical cell site location information, detectives determined that Kidder's cell phone used a cell tower in the area near Nelson's home at 11:56 p.m. on June 24, 2015, and again at 12:02 a.m. on June 25. Almost 30 minutes later, at 12:29 a.m., Kidder's cell phone used cell towers in the vicinity of his residence.

## KIDDER'S STATEMENTS

Several days after the murder, police interviewed Kidder. They noticed he had a cut on his hand, consistent with a fingernail. Kidder said he received the cut while working on June 24, 2015, but he did not report it to his employer. Kidder explained that he worked from 3 to 11:40 p.m. most weekdays and that he checked Facebook during his breaks. Kidder's workplace was near Nelson's house. Kidder provided police with a DNA sample and exemplar fingerprints and allowed police to download information from his cell phone.

Several weeks later, Kidder was taken to a police station for additional questioning about Nelson's murder. After waiving his *Miranda*[1] rights, Kidder was asked about Nelson and stated:

> I kinda classify women into like three stages: ones I could be friends with, ones I just want to see naked, and ones I

---

[1] See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

want to sleep with. . . . [Nelson] was kinda in between I want to see her naked and no feelings . . . just because she had a nice rack. . . . She had nice boobs.

Kidder repeatedly denied visiting Nelson's home on June 24, 2015—the night of the murder. But he told police he was at her home on June 23 to help her move furniture, and he made a point of mentioning he sweated heavily on Nelson's couch and mattress. At the conclusion of the interview, Kidder was arrested for Nelson's murder.

While Kidder was in jail, he called his father. The jail call was recorded. During the call, Kidder admitted he was at Nelson's house for about 20 minutes on the night she was killed.

KIDDER'S STATEMENTS
TO CELLMATE

While in jail, Kidder shared a cell with Randy Anderson for approximately 20 hours. Afterward, Anderson contacted police and offered to testify about statements Kidder made to Anderson while they were cellmates. When Anderson contacted police, he was awaiting sentencing on plea-based convictions for burglary and making terroristic threats.

At trial, Anderson testified that Kidder told him the following: On June 24, 2015, Kidder saw Nelson's Facebook post about being home alone. After getting off work around midnight, Kidder went to Nelson's home and knocked on the side door. Nelson unlocked the chain on the door and let him in. Almost immediately, Kidder somehow caused an injury to Nelson's face. She screamed, and Kidder began strangling her with his hands. As they struggled, Nelson cut Kidder's hand with her fingernail. Eventually Nelson lost consciousness. Kidder then took her to the bedroom and removed her sweatpants. Kidder did not directly admit that he sexually assaulted Nelson, but he did admit that he strangled her to death with the cell phone cord, then placed her in the bathtub and ran the water to "rins[e] DNA."

Anderson also knew several details about the crime and the crime scene before they became public knowledge. For example, Anderson knew that (1) after the murder, Kidder washed his shoes and stuffed them with newspaper to dry them; (2) Nelson had a chain lock on her door; (3) Nelson was in the fetal position in the bathtub; (4) Nelson had an L-shaped sectional couch that was cut during the assault; and (5) Nelson was wearing sweatpants the night she was killed.

## EVIDENCE FROM KIDDER'S LAPTOP COMPUTER

After Kidder was arrested, police obtained a warrant to search Kidder's home. One of the items seized pursuant to the warrant was a laptop computer found in Kidder's bedroom. A few days later, police obtained a second search warrant, authorizing an examination of Kidder's laptop computer to search and copy the following data: user account information, media files such as images and videos, document files, Internet browsing history and associated cache files, email messages, and chat and instant messages.

While searching Kidder's Internet browsing history files, a forensic analyst found that Kidder's laptop computer was used to search an Internet pornography website using terms like "strangled," "forced fucked," "fucked by intruder," and "pantyhose bound." Because the searches were conducted while the laptop computer was in private browsing mode, the available history was limited. But the forensic analyst was able to determine the website was accessed between June 20 and July 17, 2015. The analyst also determined that a video titled "Psycho-Thrillers presents Waitress Kidnapped, Raped, and Strangled" had been downloaded on July 17. That video depicted a man kidnapping a waitress, forcing her to have sex at gunpoint, strangling her with a belt when she resisted, and continuing to sexually assault her after she was dead. Three other videos with similar content were also found on Kidder's laptop computer.

## Motions to Suppress and
## Motion in Limine

Kidder moved to suppress the evidence obtained from the search of his laptop computer, arguing that neither search warrant was supported by probable cause. In addition, he argued the warrant to search the laptop computer was overbroad and insufficiently particular.

Kidder also filed a motion in limine seeking to exclude the evidence obtained from his laptop computer. He argued the evidence was hearsay, irrelevant, and unfairly prejudicial. He also argued a Neb. Evid. R. 404[2] hearing was necessary to determine the admissibility of the evidence because it involved prior bad acts.

The district court overruled the motions to suppress. It found that the search warrants were supported by probable cause or, alternatively, that either the good faith exception or the independent source doctrine applied. Regarding testimony about the Internet browsing history and violent pornography, the district court found it was admissible without a rule 404 hearing because it was "intrinsic evidence forming the factual setting of the crime or forming an integral part of the crime." The court did not permit the videos to be shown to the jury or received into evidence. But at trial, the forensic analyst was permitted, over objection, to testify about the search terms found in Kidder's Internet browsing history and to describe, in general terms, the content of the downloaded video that depicted a woman being sexually assaulted, strangled to death with a belt, then further assaulted.

## Evidence of Prior
## Sexual Assault

The jury heard evidence that in 2008, Kidder had sexually assaulted one of his friends in her home. Kidder had gone to the woman's home, claiming to be locked out of his house.

---

[2] See Neb. Rev. Stat. § 27-404 (Reissue 2016).

She let him in, and after a few minutes of talking, Kidder grabbed the woman and threw her to the ground. He got on top of her and placed his hands on her neck. She began to scream, so Kidder moved his hands to her mouth and nose, closing her airways. She briefly shoved his hands off and screamed "no," but Kidder's hands returned over her face and his grip got tighter. Eventually, she shoved Kidder's hands off again, but this time she told him "okay." Kidder then sexually assaulted the woman and left. Kidder subsequently entered a plea of no contest to a charge of attempted first degree sexual assault. The district court in the instant case ruled that evidence of the 2008 sexual assault was admissible under Neb. Evid. R. 414, Neb. Rev. Stat. § 27-414 (Reissue 2016). No error is assigned to this ruling on appeal.

### VERDICTS AND SENTENCING

The jury found Kidder guilty on count I, first degree murder, and on count II, use of a deadly weapon to commit a felony. The district court imposed a sentence of life imprisonment on count I. On count II, the court initially imposed a consecutive prison sentence of 50 to 50 years but, after a sidebar conference requested by defense counsel, reduced the term to 20 to 20 years. The State urges us to find plain error on this basis, so we set out the pertinent portion of the sentencing colloquy in its entirety:

[The court:] So, it is the judgment and sentence of this Court . . . that you be imprisoned in an institution under the jurisdiction of the Nebraska Department of Correctional Services for a period of life on Count [I] and 50 to 50 years on Count [II]. Both sentences to be served consecutively. I'll give you credit of 475 days you have against that sentence.

Also pursuant to Nebraska statute, you'll be required to give a sample of your DNA.

Is there anything further?

[Defense counsel]: Your Honor, may I approach?

THE COURT: You may.

[Defense counsel]: Thank you.

(Off-the-record discussion at the bench)

THE COURT: For clarification for the record, the offense date in this case is June 25th, 2015, which was two months prior to the law change. The law changed on Class [II] felonies in August of 2015, making it a one to 50. This was prior to the law change, which then brings the penalty range on the Class [II] as a 1 to 20.

So, therefore, I am going to clarify and in conformance with the proper statute, the Count [II], the judgment and sentence of the Court is that you be sentenced under an institution under the jurisdiction of the Nebraska Department of Correctional Services for a period of 20 to 20, which is the maximum sentence for the law at that time. Those two sentences will [run] consecutively.

The trial court entered a sentencing order reflecting the life sentence pronounced on count I and the modified sentence of 20 to 20 years' imprisonment on count II. Kidder timely appealed his convictions.

## ASSIGNMENTS OF ERROR

Kidder assigns, restated, that the district court erred in (1) overruling his motion to suppress evidence acquired as a result of seizing and searching his laptop computer and (2) overruling his motion in limine and permitting the State to offer testimony about his Internet browsing history.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[3] Regarding historical facts, an appellate court reviews the trial

---

[3] *State v. Hidalgo*, 296 Neb. 912, 896 N.W.2d 148 (2017).

court's findings for clear error.[4] But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[5]

[2] It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under rule 404(2), and the trial court's decision will not be reversed absent an abuse of discretion.[6]

## ANALYSIS

Both of Kidder's assigned errors pertain to the admission of evidence discovered through forensic analysis of his laptop computer. He argues it was error to admit this evidence because it was obtained using search warrants that lacked probable cause and were overly broad and insufficiently particular. He also argues that a rule 404 hearing was required to determine the admissibility of such evidence.

The State counters that the search warrants were supported by probable cause and were sufficiently particular, and it argues no rule 404 hearing was necessary because the laptop computer evidence was inextricably intertwined with the charged crimes. Alternatively, the State argues that any error in admitting the evidence was harmless.

For the reasons discussed below, we agree any error was harmless and thus do not address the merits of whether the evidence was properly admitted.

### Harmless Error

[3] Pursuant to Neb. Evid. R. 103, Neb. Rev. Stat. § 27-103(1) (Reissue 2016), "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial

---

[4] *Id.*

[5] *Id.*

[6] *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016), *cert. denied* ___ U.S. ___, 137 S. Ct. 1212, 197 L. Ed. 2d 254 (2017).

right of the party is affected[.]" When it comes to evidentiary error, this statutory authority forms the foundation for this court's harmless error jurisprudence. Generally speaking, in criminal cases, the purpose of harmless error review is to ensure convictions are not set aside "'for small errors or defects that have little, if any, likelihood of having changed the result of the trial.'"[7]

[4,5] Harmless error jurisprudence recognizes that not all trial errors, even those of constitutional magnitude, entitle a criminal defendant to the reversal of an adverse trial result.[8] It is only prejudicial error, that is, error which cannot be said to be harmless beyond a reasonable doubt, which requires that a conviction be set aside.[9]

[6,7] When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case.[10] In other words, harmless error review looks to the basis on which the jury actually rested its verdict.[11] The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.[12]

[8-10] In conducting this analysis, an appellate court looks to the entire record and views the erroneously admitted evidence relative to the rest of the untainted, relevant evidence of guilt.[13] Overwhelming evidence of guilt can be considered

---

[7] *State v. Britt*, 293 Neb. 381, 423-24, 881 N.W.2d 818, 847 (2016).

[8] *State v. Draper*, 289 Neb. 777, 857 N.W.2d 334 (2015).

[9] *Id.*

[10] *Id.*

[11] *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017).

[12] *Id.*

[13] *State v. Britt, supra* note 7; *State v. DeJong*, 287 Neb. 864, 845 N.W.2d 858 (2014); *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012).

in determining whether the verdict rendered was surely unattributable to the error, but overwhelming evidence of guilt is not alone sufficient to find the erroneous admission of evidence harmless.[14] An additional consideration is whether the improperly admitted evidence was cumulative and tended to prove the same point as other properly admitted evidence.[15]

The record in this case demonstrates that any error in overruling the motion to suppress and the motion in limine was harmless. Both motions related exclusively to evidence obtained from Kidder's laptop computer. That evidence showed that sometime between June 20 and July 17, 2015, Kidder used explicit terms to search with his laptop computer for violent pornographic videos depicting acts that were similar to the manner in which Nelson was killed. We must consider this evidence relative to the rest of the evidence of Kidder's guilt.

First, there was uncontroverted physical evidence establishing Kidder's guilt. Kidder's DNA was found on Nelson's fingernails and on the cell phone cord used to strangle her. A few days after Nelson's body was discovered, Kidder was observed to have a cut on his hand consistent with a fingernail mark, and when Nelson's body was discovered, her thumbnail was bent back.

Next, there was detailed evidence of a confession. Kidder's cellmate testified that Kidder confessed to Nelson's murder. The cellmate's credibility was strengthened by the fact that he knew details about the crime and the crime scene that had not been released to the public.

Finally, in addition to the physical evidence and the confession, there was considerable circumstantial evidence establishing Kidder had both the motive and the opportunity to commit the crimes. Kidder left work shortly before the crimes

---

[14] *State v. Britt, supra* note 7; *State v. DeJong, supra* note 13.

[15] *State v. Britt, supra* note 7; *State v. Trice*, 292 Neb. 482, 874 N.W.2d 286 (2016).

occurred, and cell site location information placed his cell phone in the vicinity of Nelson's home around the time she was assaulted and strangled. Kidder also admitted to his father, in a recorded telephone conversation, that he was at Nelson's house for about 20 minutes on the night of the murder. Kidder admitted to investigators he wanted to "see [Nelson] naked," and Kidder's text messages to Nelson contained sexual overtures that were either rebuffed or ignored. There was evidence that in 2008, Kidder had choked and sexually assaulted a friend after she allowed him into her home. Likewise, Nelson was a friend of Kidder's and there were no signs of forced entry into Nelson's home.

The untainted, relevant evidence of Kidder's guilt was overwhelming, and the laptop computer evidence was cumulative of other relevant evidence tending to prove motive. Thus, even if the evidence obtained from Kidder's laptop computer was erroneously admitted at trial, we find the guilty verdicts were surely unattributable to that evidence. Any error in admitting the evidence from Kidder's laptop computer was harmless beyond a reasonable doubt. We therefore reject both of Kidder's assignments of error and affirm his convictions.

### PLAIN ERROR IN SENTENCING

The State asks that we find plain error in the sentence imposed on count II. It contends the trial court's initial sentence to a prison term of 50 to 50 years was validly imposed and took effect as soon as it was pronounced and that the court's subsequent reduction of the term to 20 to 20 years' imprisonment was a nullity. We agree.

[11] Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.[16]

---

[16] *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017).

The judge's remarks during sentencing suggest that during an off-the-record sidebar discussion, the court was advised that the sentence it had just pronounced on count II was outside the penalty range for Class II felonies. But the sentence originally imposed was not outside the penalty range.

On count II, Kidder was found guilty of use of a deadly weapon, other than a firearm, to commit a felony.[17] At the time of Kidder's offense, and at the time of his sentencing, this crime was classified as a Class II felony,[18] punishable by a minimum of 1 year's and a maximum of 50 years' imprisonment.[19] Thus, the court's initial pronouncement on count II (imposing 50 to 50 years' imprisonment) was valid, and the question becomes whether the subsequent modification of that valid sentence was plain error.

[12,13] We have consistently applied the rule that a sentence validly imposed takes effect from the time it is pronounced,[20] and we have explained that any subsequent sentence fixing a different term is a nullity.[21] We have applied this rule to attempts to modify a valid pronouncement during the sentencing hearing[22] and to attempts to modify a valid sentence that has been put into execution.[23] Thus, any attempt

---

[17] See Neb. Rev. Stat. § 28-1205(1)(a) and (b) (Reissue 2016).

[18] § 28-1205(1)(b).

[19] Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2014).

[20] See, *State v. Bol*, 288 Neb. 144, 846 N.W.2d 241 (2014); *State v. Clark*, 278 Neb. 557, 772 N.W.2d 559 (2009); *State v. Schnabel*, 260 Neb. 618, 618 N.W.2d 699 (2000); *State v. Kinney*, 217 Neb. 701, 350 N.W.2d 552 (1984); *State v. Cousins*, 208 Neb. 245, 302 N.W.2d 731 (1981); *State v. Snider*, 197 Neb. 317, 248 N.W.2d 342 (1977), *overruled on other grounds, State v. Cousins, supra* note 20.

[21] *State v. Kinney, supra* note 20; *State v. Cousins, supra* note 20; *State v. Snider, supra* note 20.

[22] See, *State v. Kinney, supra* note 20; *State v. Cousins, supra* note 20.

[23] See, *State v. Clark, supra* note 20; *State v. Schnabel, supra* note 20.

to modify a sentence validly imposed is of no effect, and the original sentence remains in force.[24]

It is possible, in limited circumstances, to correct an inadvertent mispronouncement of a valid sentence before the defendant has left the courtroom,[25] but that is not the circumstance here. The district court did not mispronounce its initial sentence of 50 to 50 years' imprisonment on count II. To the contrary, it is evident from the judge's sentencing remarks that she intended to sentence Kidder to the maximum term of imprisonment authorized by the law. Because the sentence originally pronounced was valid, it took effect as soon as it was pronounced and any attempt thereafter to modify it to a term of 20 to 20 years' imprisonment was plainly erroneous and of no legal effect.

We thus vacate that portion of the sentencing order imposing a term of 20 to 20 years' imprisonment on count II and remand the cause to the district court with directions to reinstate the valid term originally pronounced on that count.

## CONCLUSION

For the foregoing reasons, we reject Kidder's assignments of error and affirm his convictions. We find plain error in modifying the term of the sentence validly imposed on count II and therefore vacate that portion of the sentencing order and remand the cause to the district court with directions to reinstate the term of 50 to 50 years' imprisonment originally pronounced. In all other respects, the judgment of the district court is affirmed.

Affirmed in part, and in part vacated
and remanded with directions.

Kelch, J., not participating in the decision.
Wright, J., not participating.

---

[24] *Id.*

[25] See *State v. Clark, supra* note 20.