IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. CARRASCO-ZELAYA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

ORLING A. CARRASCO-ZELAYA, APPELLANT.

Filed December 11, 2018.    No. A-17-509.

Appeal from the District Court for Douglas County: HORACIO J. WHEELOCK, Judge. Affirmed.

Thomas Campbell, of TLN Law, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

Following a bench trial in the Douglas County District Court, Orling A. Carrasco-Zelaya, also known as Edwin Elvir-Palma, was convicted of motor vehicle homicide and leaving the scene of an accident resulting in death. On appeal, Carrasco-Zelaya claims the district court failed to provide him with a fair and impartial trial, improperly overruled his objections and motions at trial, and erred in overruling his motion for a new trial. He also claims there was insufficient evidence to support his convictions. We affirm.

## BACKGROUND

On the evening of April 15, 2016, and into the early morning hours of April 16, Carrasco-Zelaya and Margarito Nava-Luna were socializing and consuming alcohol at a residence and later at a bar in Omaha, Nebraska. Carrasco-Zelaya and Nava-Luna left the bar shortly after

- 1 -

2 a.m. in Carrasco-Zelaya's vehicle with Carrasco-Zelaya driving. Less than 15 minutes later, a motorist found the body of Nava-Luna lying in the street near the intersection of North 104th Avenue and Manderson Plaza in Omaha; Nava-Luna, who had suffered multiple injuries, was declared deceased shortly after paramedics arrived on scene. A short time later, a law enforcement officer stopped Carrasco-Zelaya after a 911-caller reported observing an erratic driver; he was arrested on suspicion of driving under the influence of alcohol.

In connection with the death of Nava-Luna, Carrasco-Zelaya was charged by amended information on February 3, 2017, with Count 1, motor vehicle homicide under Neb. Rev. Stat. § 28-306(1) and (3)(c) (Reissue 2016), a Class II felony, and Count 2, leaving the scene of a personal injury accident resulting in serious bodily injury or death under Neb. Rev. Stat. § 60-697 (Cum. Supp. 2016), a Class III felony. See Neb. Rev. Stat. § 60-698 (Cum. Supp. 2016).

A 5-day bench trial commenced on February 27, 2017; two certified court interpreters were present. Prior to any testimony or evidence, the State moved the court to sequester the defense witnesses, and did not "have an issue with it being mutual and reciprocal." Defense counsel noted there was one defense witness (later identified as Ronald Caceres-Zelaya) present in the courtroom at the time, and requested permission from the court to have a moment to speak to the witness and explain what was happening; counsel said the witness speaks Spanish and might not understand what the court was saying. Without responding to defense counsel, the court granted the State's motion, and asked defense counsel to have his witness leave. Defense counsel responded, "Yes, Judge," and asked, "May I have just five minutes to explain it to him in Spanish?" The court responded, "No. Just ask him to leave, please." Defense counsel then asked the witness to leave and the trial proceeded.

STATE'S WITNESSES

There were numerous witnesses called by the State. We set forth summaries of only those witnesses most relevant to our review of the case.

Wilson Alarcon testified through an interpreter that he, Carrasco-Zelaya, and Nava-Luna were drinking alcohol at Alarcon's residence on the evening of April 15, 2016. They ate dinner at his residence and the three of them finished a 24-pack of "the little Coronas." Carrasco-Zelaya and Nava-Luna then left Alarcon's residence at 9 p.m. During his testimony, Alarcon was shown exhibit 158, a photograph, and identified the person in it as Nava-Luna.

Diego Galan testified that on the night of April 15, 2016, Carrasco-Zelaya called him and they decided "to go have a drink." Galan met up with Carrasco-Zelaya at a gas station. Carrasco-Zelaya was driving a GMC SUV and was accompanied by a passenger Galan did not know at the time. Carrasco-Zelaya and the passenger then followed Galan to a bar; Galan thought they arrived at the bar at approximately 11:30 p.m. Galan stated that while they were at the bar, he noticed Carrasco-Zelaya was drunk and told him it would be a good idea for his brother to pick him up. Galan eventually left the bar that night without Carrasco-Zelaya and his friend.

Andrew Shirley testified he was working as a bartender at the bar on the night of April 15, 2016. He got off around 10 p.m., but stayed at the bar to play pool. He stated three Hispanic males walked into the bar and they "were kind of intoxicated already when they came in." Shirley left the bar at approximately 12:30 a.m. on April 16, but worked later that day. A police officer came to the bar and asked to see the security footage from the night of April 15, and Shirley assisted the

officer in viewing the footage. Shirley stated the bar has a video surveillance system with between 14 and 16 cameras; some capture the inside of the bar and some capture the exterior. According to Shirley, the surveillance video from that night showed the three Hispanic males enter the bar at approximately 11:37 p.m. The surveillance video also showed two males "stumbling around" later outside of the bar at approximately 2:11 a.m. on April 16; the two males approached a GMC at 2:13 a.m., and it pulled out of the parking lot and turned onto a road at 2:14 a.m.

Galan was also shown the bar's security footage during his testimony. He testified it showed him driving his car and pulling in at the bar, the GMC SUV Carrasco-Zelaya was driving as it was parking next to Galan's car, and Carrasco-Zelaya getting out from the driver seat of the GMC. He said the footage also showed Carrasco-Zelaya later getting into the GMC with his friend, backing it out, and driving away. During his testimony, Galan was also shown exhibit 158 (the photograph of the man Alarcon had previously identified as Nava-Luna), and Galan confirmed it was Carrasco-Zelaya's friend who was at the bar with them, and who got into the passenger seat of the GMC driven by Carrasco-Zelaya.

Michael Stephens testified he was leaving a friend's home on North 104th Avenue "a little after 2:00 a.m.," on April 16, 2016, and came across a body in the road at the intersection of North 104th Avenue and Manderson Plaza. Stephens parked his motorcycle in an adjacent parking lot, ran back to his friend's house, told the people there what he had seen, and one of them called 911 while everyone went outside. The 911 dispatcher directed them as one of the other people from the house administered chest compressions to the victim because they did not find a pulse.

Mark Stevens, a firefighter-paramedic for the Omaha Fire Department, testified he and his partner were two of the emergency responders to the scene at North 104th Avenue and Manderson Plaza in response to the emergency call at 2:26 a.m. on the morning of April 16, 2016. When they arrived they found "the patient laying in the street" and they began checking for vitals, a pulse, and breathing. The patient had injuries to his head, his left foot and left leg, and "road rash" on his torso. The emergency responders used an "AED" device to determine if there was "any electrical activity in the heart." Finding none, and having assessed his injuries as "not viable with life," they declared him dead at approximately 2:34 a.m. The emergency responders found a wallet with some ID on the deceased man, and the name on the ID was Nava-Luna.

Joseph Martinec, Jr., a sergeant for the Douglas County Sheriff's Office, was on duty during the early morning hours of April 16, 2016. While parked at 134th Street and Camden Avenue in Omaha, he heard a broadcast about a "possible intoxicated driver eastbound on Fort Street from 144th in a silver SUV." When the broadcast ended, a vehicle pulled up next to his cruiser and the two female occupants stated that they were being followed and harassed by a guy in a silver SUV; they also stated they were the ones who had called 911. When a silver SUV pulled into the neighborhood where Sergeant Martinec was parked, the females identified it as the vehicle that had been following them. Sergeant Martinec activated his emergency lights and made a traffic stop of the silver SUV a short distance down Camden Avenue.

Sergeant Martinec made contact with the driver of the SUV, later identified as Carrasco-Zelaya. Sergeant Martinec observed a heavy odor of alcoholic beverage coming from Carrasco-Zelaya, and that he had bloodshot eyes and was very slow to respond to questions. Based on those observations, Sergeant Martinec arrested Carrasco-Zelaya and placed him in the back of his cruiser at 2:46 a.m. Sergeant Martinec then began the process of impounding the vehicle, a

gray 2007 GMC Acadia. Anthony Incontro, a Douglas County Deputy Sheriff, testified that he arrived at the location of the traffic stop at approximately 2:51 a.m. and completed the DUI portion of the arrest. He transported Carrasco-Zelaya to Douglas County Corrections and administered an evidentiary breath test, the result of which was .239 grams of alcohol per 210 liters of breath.

Todd Reeson, a police officer for the city of Omaha, testified he was working on April 16, 2016, and was asked to locate Nava-Luna's family to do a death notification for the family. Officer Reeson and another officer had a bag of Nava-Luna's personal property, including a cell phone. When the cell phone rang, Officer Reeson called the number back from his "unit cell phone"; he spoke to a woman who identified herself and said she was Nava-Luna's wife. The woman's son was then contacted as well, and the officers provided a death notification. The officers were trying to trace Nava-Luna's steps to get a lead in the case, because there did not appear to be any witnesses to his death. The woman and her son were able to provide the officers with Nava-Luna's last known location as an apartment with a man they believed went by the name of "Estereo Gonzalez." When the officer went to the apartment they made contact with Alarcon, who then directed them to Carrasco-Zelaya's wife. She informed the officers that "Estereo Gonzalez" was Carrasco-Zelaya, and she told them that he had been arrested the night before. The officers confirmed that he had been arrested, and learned the GMC Acadia he was driving had been impounded as a result of the DUI arrest. They then went to the impound lot and inspected the vehicle, but found no damage. They proceeded to the Douglas County Correctional Center to talk to Carrasco-Zelaya. Carrasco-Zelaya confirmed to the officers that he was with Nava-Luna at the bar, but claimed he left the bar alone and got lost while driving until he was pulled over by law enforcement.

As part of the investigation, law enforcement subsequently reviewed the security footage from the bar, which showed Carrasco-Zelaya and Nava-Luna leaving together. Afterwards, the impounded vehicle was inspected again. They located what appeared to be blood and a possible hand print or finger marks on the rear bumper of the vehicle. Investigating officers obtained a search warrant to put the vehicle on a "hydraulic lift" and inspect the undercarriage, and they requested the "crime lab" to come out.

Molly Reil, a forensic investigations specialist with the Omaha Police Department, testified she took photographs and swabs of apparent blood and/or tissue from areas on the impounded vehicle, including on the rear bumper, the spare tire underneath the vehicle, the "gas tank support strap towards the middle line of the vehicle," the "gas tank support strap facing the ground," the drive shaft, and the "exhaust manifold flange." These swabs were documented in her report as items 14-19 respectively; the report was admitted into evidence as exhibit 3. The parties stipulated at trial that a proper and complete chain of custody was maintained at all times for items 14-19, as well as item 22, which was blood saved from Nava-Luna's autopsy.

Joseph Choquette, a DNA analyst at the University of Nebraska Medical Center/Human DNA Identification Laboratory, testified he was able to generate a DNA profile from the "swab[s] of apparent blood" from the rear bumper, spare tire, gas tank strap, and gas tank strap "facing ground," and a "swab of apparent blood and tissue" from the drive shaft (report items 14-18), as well as the DNA sample taken from Nava-Luna (report item 22). A "swab of apparent blood and tissue from exhaust manifold flange of Acadia" (report item 19) did not yield a DNA profile, and "appeared to be black and ashy." A comparison revealed that Nava-Luna "could not be excluded

- 4 -

as the contributor to the [five] DNA sample[s]" from which Choquette was able to get DNA profiles. Choquette stated, "The probability of an unrelated individual matching the DNA profile from [report items 14-18] given that . . . Nava-Luna expresses this profile is 1 in 38.1 quintillion for Caucasians; 1 in 171 quintillion for African-Americans; and 1 in 1.57 quintillion for American Hispanics."

Robert Bowen, a physician and practicing pathologist, testified he performed an autopsy on Nava-Luna's body on April 17, 2016, and collected a blood sample from Nava-Luna at that time. Dr. Bowen stated Nava-Luna had injuries to his spleen, pelvic bones, and bladder, multiple rib fractures, lacerations to the head, abrasions to multiple parts of his body, a compound fracture to his left ankle, a tear in his heart, and punctured lungs. Dr. Bowen determined the cause of death was "[b]lunt force trauma to the chest and abdomen." Dr. Bowen was asked, "Is that cause of death . . . consistent with a crush injury, the force or weight of an automobile?" He responded, "Yes." Dr. Bowen also stated a tear in the heart could be explained by the chest being "compressed onto the heart, the heart gets squeezed between the vertebral bodies and the sternum. . . . the heart gets displaced and torn between the two."

Nicholas Prescott, a police officer and "accident reconstructionist for the traffic unit" of the Omaha Police Department, testified that he assisted in the investigation of the death of Nava-Luna. Prescott was asked,

> [W]hen you look at the totality of the circumstances, all of the evidence known here, the roadway evidence, blood and tissue on the bottom of the GMC Acadia, the lack of damage to the GMC Acadia, the time line that we're talking about here, the locations of Nava-Luna and [Carrasco-Zelaya], all of those things lead you to the conclusion that . . . Carrasco-Zelaya ran over . . . Nava-Luna in the intersection of 104th and Manderson in the morning hours of April 16, 2016?

Prescott responded, "That's correct." When asked if what "[he] was able to observe and evaluate was consistent with a low-speed impact" "[a]nd a body being drug or run over underneath that vehicle as it curves around the roadway down Manderson to 104th," Prescott responded in the affirmative.

Kevin Potter, a police officer assigned to the "uniform patrol bureau, traffic unit, accident investigations squad" in the Omaha Police Department, testified that it was his opinion based on the "blood and tissue evidence that was located underneath the vehicle," that Nava-Luna "was underneath the vehicle, and the vehicle was backing up. He was being drug underneath the rear two-thirds portion of the vehicle."

DEFENDANT'S WITNESSES

Dr. Robert Rothfeder, a physician, testified for the defense as an expert "medical doctor in emergency room medicine." He had reviewed relevant police reports, photographs of the accident scene, and the report and photographs from the autopsy. Dr. Rothfeder opined that the autopsy report was correct in its assessment of the cause of death as blunt force trauma to the chest and abdomen, but he stated that a crush injury by the weight of a vehicle would not cause a laceration to the heart.

Ronald Caceres-Zelaya testified through an interpreter that he worked with Carrasco-Zelaya and Nava-Luna. On April 15, 2016, Caceres-Zelaya, Carrasco-Zelaya, and Nava-Luna were going to go get something to eat in Carrasco-Zelaya's GMC Acadia when their shift ended at 3 p.m. However, the passenger-side rear tire was low on air, so they attempted to replace it with the spare tire. They could not get the tire off to replace it so Nava-Luna decided to get under the vehicle (which had been lifted by a jack) to try to hit the tire off because he was "bigger and stronger." Nava-Luna "was holding onto the front part on the car" and "was kicking the tire really hard." While underneath the vehicle, Nava-Luna cut his right hand and was bleeding, but he did not stop kicking the tire. He "kept switching to a different position to see if the tire would come out, but it wasn't possible. The tire didn't come out." Eventually they decided not to remove the tire, and Nava-Luna came out from underneath the vehicle. They had already taken the spare tire down, but when they tried to "put it back up again" the cable attached to the tire "had been stuck on something." Nava-Luna went back underneath the vehicle so he could lift the tire up and wrap the cable around it so it would "stay in the place where it was." They then drove to a gas station to put air in the tire, and then Caceres-Zelaya was dropped off at his residence.

During cross-examination, Caceres-Zelaya stated that Carrasco-Zelaya is his stepbrother. He testified he had spoken on the telephone with Carrasco-Zelaya "four or five times" since the trial began on February 27, 2017 (Caceres-Zelaya testified on March 2); Carrasco-Zelaya always "calls me to see how I'm doing." During one conversation, Caceres-Zelaya told Carrasco-Zelaya that he "was going to testify about what [he] saw that afternoon"; Carrasco-Zelaya "only said that it was fine that I talk about what we did that afternoon." At that point, the State asserted Caceres-Zelaya was in violation of the sequestration order issued by the Court. Carrasco-Zelaya's counsel reminded the court that the sequestration order was given in English and counsel was not allowed to explain the sequestration order to Caceres-Zelaya in Spanish, but was only given time to tell him to leave the courtroom. The Court stated, "I'm going to take the motion under advisement. I will ask that you continue with your [c]ross-examination."

When cross-examination continued, Caceres-Zelaya testified that he did not really remember Carrasco-Zelaya from growing up because he (Caceres-Zelaya) was "really little" and they did not live together. But when Caceres-Zelaya first came to the United States in 2015, he lived with Carrasco-Zelaya and Carrasco-Zelaya's wife for a while before moving to Texas; he lived with them again for 3 months in 2016 when he moved back to Nebraska. Caceres-Zelaya stated he talked to Carrasco-Zelaya's wife about his testimony and "told her that [he] was going to talk about what [he] had seen that day." Caceres-Zelaya did not tell anyone about Nava-Luna cutting his hand on April 15, 2016, because "no one had ever asked" him. He acknowledged he was aware that Carrasco-Zelaya had been in jail since April 16, 2016, and said that Carrasco-Zelaya's wife and attorney told him about the charges against Carrasco-Zelaya. He found out from "the news" and Carrasco-Zelaya's wife that there was DNA evidence in the case; although he later testified that no one told him about DNA evidence, but that he "knew about the blood that was on the SUV from the pictures that were taken" in "the news."

Steve Sokol, a civil engineer, testified for the defense as an accident reconstructionist. He reviewed the photographs of the accident scene, "measurements taken at accident scene," and visited the scene approximately 8 months after the accident. After specific testimony was given by Sokol, defense counsel asked, "Having reviewed all of the actual evidence and taking into account

you're going to this scene and taking your own measurements, as an accident reconstructionist, in your experience, can you -- or would you conclude that this vehicle [the GMC Acadia] caused this scene?" Sokol responded, "Based on everything I know, I couldn't conclude that to a reasonable degree of certainty, no." Counsel asked, "And you're telling me right now that if I conclude this vehicle caused that scene and killed this man, that would be improper?" And Sokol responded, "Based on the -- all of the evidence I have seen, I would say yes."

During cross-examination, Sokol testified that the blood underneath the vehicle is evidence that at some point Nava-Luna was underneath the vehicle, but that does not mean that Nava-Luna was drug underneath the vehicle. He agreed that photographs from the accident scene show tire marks and that blood is interspersed with those tire marks, and there were also bluish marks that would be consistent with blue jeans; this would all be consistent with Nava-Luna being drug along the roadway. He also testified that the lack of damage to the vehicle would be indicative of a slow-speed impact; but he said he could not rule out high speed. The State then asked, "And so when we put those two together, lack of damage, low speed, dragging, is that not indicative of this vehicle going at a low speed dragging . . . Nava-Luna down the street?" Sokol responded, "Well, I can't look at -- I have to look at all of the evidence," for example, there was no explanation for why Nava-Luna's shoes were found away from the body ("with high-speed impacts, you often see the pedestrian separated from the shoes"). However, he acknowledged that if the shoes had been moved, or if Nava-Luna was not wearing shoes at the time of impact, that might explain why the shoes were found away from his body.

MOTION TO EXCLUDE TESTIMONY AND JUDGMENT

After the defense rested, the district court took up the State's motion to exclude the testimony of Caceres-Zelaya; the court ruled his testimony would not be excluded.

In its "Judgment" filed on March 3, 2017, the district court found Carrasco-Zelaya guilty of Counts 1 (motor vehicle homicide) and 2 (leaving the scene of a personal injury accident resulting in serious bodily injury or death). Carrasco-Zelaya's motion for new trial was overruled. On May 11, he was sentenced to 20 to 30 years' imprisonment for Count 1, and 4 to 4 years' imprisonment on Count 2; the sentences were to run consecutively and he was given credit for 391 days of time served.

Carrasco-Zelaya appeals.

ASSIGNMENTS OF ERROR

Carrasco-Zelaya assigns, summarized and reordered, that the district court erred by (1) failing to provide him with a fair and impartial trial because of its handling of Caceres-Zelaya's testimony, (2) improperly overruling his objections and motions at trial, and (3) finding there was sufficient evidence to support his convictions.

STANDARD OF REVIEW

In a criminal case, an appellate court reviews findings of fact for clear error. *State v. Martinez*, 295 Neb. 1, 886 N.W.2d 256 (2016).

We will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction.

*State v. Schuller*, 287 Neb. 500, 843 N.W.2d 626 (2014). In making this determination, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. *Id*. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

## ANALYSIS

### FAILURE TO PROVIDE FAIR AND IMPARTIAL TRIAL

Carrasco-Zelaya claims the district court failed to provide him with a fair and impartial trial because the court gave Caceres-Zelaya's testimony no weight, which Carrasco-Zelaya argues was due to "the trial court . . . finding a de facto violation of its sequestration order[.]" Brief for appellant at 12. He asserts that because the court did not allow him to explain the sequestration order to Caceres-Zelaya in Spanish, "[t]he initial error was caused by the trial court" because Caceres-Zelaya "did not even know of the courts [sic] sequestration order." *Id.*

The district court's sequestration order was given at the beginning of trial on February 27, 2017. At the conclusion of trial, when it took up the State's motion to exclude the testimony of Caceres-Zelaya's testimony in light of the sequestration order, the court acknowledged that there was a language issue when the sequestration order was given. The court asked defense counsel if he had an opportunity to discuss the sequestration order with the witness at some point between February 27 and March 2. Counsel stated he did not have an opportunity because the witness left and counsel was in court. Counsel further stated, "When I got out, I don't know where he was, and, honestly, after I asked and you said, no, I couldn't talk to him, it honestly didn't even ever come to my mind ever again." The court reminded counsel that counsel had a duty to discuss the sequestration order with his potential witnesses. But the court nevertheless said it would not exclude the testimony of Caceres-Zelaya. However, in its ruling, the court still had to consider the credibility of Caceres-Zelaya's testimony.

Carrasco-Zelaya contends the district court erred by ruling that Caceres-Zelaya's testimony was biased and that it should be given no weight. Carrasco-Zelaya's arguments center around the district court's explanation of its factual findings and its credibility assessments announced prior to the verdict where it stated, "The Court had an opportunity to observe the testimony of Ronald Caceres. The Court finds Ronald Caceres' testimony to be biased, untruthful, and not credible." At the hearing on the motion for a new trial, the court further clarified its credibility finding by stating:

> At issue here is the testimony of Mr. Caceres who I have found to be not credible at all. I gave his testimony zero weight in evaluating the evidence. He was communicating with Mr. Carrasco during the trial, and I had an opportunity to observe his demeanor, his eye contact, the way he was responding to questions, and I found him to have zero credibility.

Carrasco-Zelaya claims the district court "abused its discretion in finding a de facto violation of its sequestration order even though . . . there was no prejudice to the State, . . . and [Caceres-Zelaya] did not even know of the courts [sic] sequestration order due to the trial court not allowing [defense counsel] to tell him of the order." Brief for appellant at 12. The district court

did note that Caceres-Zelaya communicated with Carrasco-Zelaya on multiple occasions during the trial, including communication regarding the subject of his testimony (though Caceres-Zelaya initially denied discussing his testimony, he subsequently testified he told Carrasco-Zelaya he "was going to testify about what [he] saw that afternoon") and he also communicated with Carrasco-Zelaya's wife about his testimony.

However, the district court's explanation for why it found Caceres-Zelaya's testimony not credible went beyond his communications with Carrasco-Zelaya and his wife. The court explained the factors it assessed in determining Caceres-Zelaya's credibility, including Caceres-Zelaya's demeanor, eye contact, and his responses to questions. Additionally, Caceres-Zelaya's testimony reveals he is Carrasco-Zelaya's stepbrother, and Caceres-Zelaya resided with Carrasco-Zelaya and his wife on two separate occasions in the past. The trial court, as the fact finder, could reasonably find that Caceres-Zelaya's relationship and communications with Carrasco-Zelaya and his wife created a bias in Caceres-Zelaya as a witness. And the court, as the fact finder, could certainly use its observations of Caceres-Zelaya's demeanor, eye contact, and responses to make a credibility determination.

The credibility of witnesses is a determination within the province of the trier of fact, *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017), and the court's determination of Caceres-Zelaya's credibility was within its role as the trier of fact in Carrasco-Zelaya's bench trial. See *State v. Cotton*, 299 Neb. 650, 910 N.W.2d 102 (2018) (an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact). Instead, we review findings of fact for clear error. *State v. Martinez, supra*. We find no clear error in the district court's assessment of Caceres-Zelaya's testimony. We note that demeanor of a witness and bias of the witness are listed in NJI2d Crim. 5.2 as two of the factors permitted to be used to determine the weight to be given to a witness' testimony in a criminal case where the fact finder is a jury, and we find no clear error by the court in using those same factors as the fact finder in this case to assess the credibility of Caceres-Zelaya's testimony.

Carrasco-Zelaya also claims the district court erred by denying his motion for a new trial. He again argues that the court "found a de facto violation of its sequestration order[.]" Brief for appellant at 15. He asserts that "[h]ad the court not denied counsel for [Carrasco-Zelaya] the opportunity to explain the courts [sic] [sequestration] order, there would have been no alleged violation later for the court to find, and thereby deny [Carrasco-Zelaya's] motion for [a] new trial." *Id.* However, because we have already found no error with regard to the court's handling of Caceres-Zelaya's testimony, we also find that the district court did not abuse its discretion when it denied the motion for new trial. See *State v. Lester*, 295 Neb. 878, 898 N.W.2d 299 (2017) (denial of a motion for new trial is reviewed for an abuse of discretion).

OBJECTIONS AND MOTIONS AT TRIAL

In the "Assignment of Errors" section of his brief, Carrasco-Zelaya set forth this particular error as follows:

> 2. The trial court erred when it improperly overruled the Defendant[']s objections and motions during trial.
>
> a. The trial court improperly allowed the State to cross-examine witnesses about potential bias but denied the same opportunity to Defendant.

- 9 -

As written, Carrasco-Zelaya limited his "objections and motions" assignment of error to objections and motions related to witness bias. However, in the argument section of his brief, Carrasco-Zelaya initially challenges the district court's ruling on a relevancy objection made during his counsel's cross-examination of Reil (the forensic investigations specialist). Reil was unable to identify certain items in her own photographs and speculated that there appeared to be feces under the vehicle. Defense counsel then asked Reil if it was important to know how these things got under the vehicle, and the State objected on relevance; the objection was sustained. Carrasco-Zelaya claims this information was extremely relevant to the case, so the court erred by granting the State's objection. However, as noted by the State in its brief, "this had nothing to do with bias, which is the assigned error." Brief for appellee at 22. An appellate court does not consider errors which are argued but not assigned. *State v. Wofford*, 298 Neb. 412, 904 N.W.2d 649 (2017). We therefore do not consider Carrasco-Zelaya's arguments related to the relevancy objection during his cross-examination of Reil.

Carrasco-Zelaya's argument related to bias arises from the district court's ruling on relevancy objections made by the State during defense counsel's cross-examination of one of the police officers who participated in the investigation. The following exchange took place:

> [Defense counsel]: The State wants a conviction here; correct?
> [Witness]: Correct.
> [Prosecutor]: Objection, relevance.
> THE COURT: Sustained.
> [Defense counsel]: You're testifying in an effort to convict [Carrasco-Zelaya]; correct?
> [Prosecutor]: Objection, relevance.
> THE COURT: Sustained.
> [Defense counsel]: For sidebar, appeal purposes, Judge, I believe in one of the rules of evidence bias is allowed.

Carrasco-Zelaya argues that "bias is a routine cross examination inquiry that is routinely granted by trial courts," and that the court "denied [him] the opportunity to cross-examine officers about their potential biases in favor of the State, but then allowed the State the chance to inquire about biases against [him]." Brief for appellant at 14. He also asserts that "allowing the State cross that it does not allow [him] is unfair, and improper." *Id.* He concludes that "a fair trial demands that what the court allows one side it will allow the other." *Id.*

We see Carrasco-Zelaya's argument as having two parts. The first is that he was denied the right to cross-examine the State's witness as to biases the witness might have possessed. Second, he claims he did not receive a fair trial because he was not allowed to cross-examine the State's witness to the same extent the State was allowed to cross-examine Caceres-Zelaya, a defense witness. We will address his arguments in that order.

Regarding Carrasco-Zelaya's argument on cross-examining a witness for bias, we consider the following.

> The Sixth Amendment guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him or her. The main and essential purpose of confrontation is to secure the opportunity for cross-examination. An accused's

constitutional right of confrontation is violated when either (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness or (2) a reasonable jury would have received a significantly different impression of the witness' credibility had counsel been permitted to pursue his or her proposed line of cross-examination.

*State v. Jenkins*, 294 Neb. 475, 489-90, 883 N.W.2d 351, 362 (2016). However, harmless error jurisprudence recognizes that not all trial errors, even those of constitutional magnitude, entitle a criminal defendant to the reversal of an adverse trial result. *State v. Kidder*, 299 Neb. 232, 908 N.W.2d 1 (2018). It is only prejudicial error, that is, error which cannot be said to be harmless beyond a reasonable doubt, which requires that a conviction be set aside. *Id.*

Assuming for argument purposes that the objections were improperly sustained, any such error would be harmless. The first question defense counsel asked the witness was, "The State wants a conviction here; correct?"--this is not a question the witness could have properly answered on behalf of the State without speculating as to the State's intent. Moreover, the State's intent was already made clear by the fact that it had filed the information and proceeded with the trial against Carrasco-Zelaya. Accordingly, Carrasco-Zelaya cannot show any prejudice by not being allowed to ask the witness this particular question because the State was clearly seeking a conviction at trial. The second question defense counsel asked the witness was, "You're testifying in an effort to convict Mr. Carrasco; correct?" The answer to defense counsel's question is self-evident as the court would have been aware that the officer was called as a witness for the State as part of its case-in-chief in an effort to convict Carrasco-Zelaya. Carrasco-Zelaya cannot demonstrate prejudice by being prevented from pursuing these particular questions, and thus, even assuming there was error, it was harmless.

We now address Carrasco-Zelaya's second argument that he did not receive a fair trial because he was not allowed to cross-examine the State's witness to the same extent the State was allowed to cross-examine Caceres-Zelaya, a defense witness. However, as the State notes in its brief, Carrasco-Zelaya's counsel did not object at trial to the State's cross-examination regarding Caceres-Zelaya's biases, therefore, Carrasco-Zelaya waived any objection to those questions being asked. *State v. Casterline*, 293 Neb. 41, 878 N.W.2d 38 (2016) (failure to make a timely objection waives the right to assert prejudicial error on appeal). Additionally, Carrasco-Zelaya did not complain to the district court that such questions were improper given that he was not allowed to ask such questions of the State's witnesses. Therefore, as noted by the State, "Carrasco-Zelaya cannot claim that the district court made disparate and unfair rulings on the matter." Brief for appellee at 23. See *State v. Haynes*, 299 Neb. 249, 908 N.W.2d 40 (2018) (an appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court).

## SUFFICIENCY OF EVIDENCE

Carrasco-Zelaya argues "due to the errors of the court, there is an insufficiency of evidence [to support his convictions]" because the testimony of Caceres-Zelaya was given no weight by the court, and because the court did not allow him to cross-examine witnesses to the same extent the State was allowed to cross-examine. Brief for appellant at 17. He asserts that Caceres-Zelaya's testimony regarding Nava-Luna cutting his hand while attempting to change a tire underneath the

vehicle is "critical" because "[n]one of the States [sic] witnesses could explain how the accident happened. In fact, many of the States [sic] witnesses had to speculate about certain evidence." *Id.* at 16. However, as we have previously stated, the district court did not err by assigning Caceres-Zelaya's testimony no weight, nor was Carrasco-Zelaya prejudiced by the court's rulings regarding the cross-examination of witnesses during the trial.

As the State notes in its brief, "Carrasco-Zelaya does not address the elements of either his offenses or contend that the evidence was insufficient to satisfy any particular elements of either offense." Brief for appellee at 21. Nevertheless, we will briefly address whether the evidence was sufficient to prove the elements of the crimes. See *State v. Cotton*, 299 Neb. 650, 910 N.W.2d 102 (2018) (the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt).

Carrasco-Zelaya was convicted of motor vehicle homicide in violation of § 28-306(1). Section 28-306(1) defines motor vehicle homicide as occurring when "a person . . . causes the death of another unintentionally while engaged in the operation of a motor vehicle in violation of the law of the State of Nebraska or in violation of any city or village ordinance." In the charging information, the State alleged that Carrasco-Zelaya unintentionally caused the death of Nava-Luna while engaged in the unlawful operation of a motor vehicle, and while in violation of Neb. Rev. Stat. § 60-6,196 (Reissue 2010) (driving under the influence of alcohol or drugs) or Neb. Rev. Stat. § 60-6,197.06 (Supp. 2015) (operating motor vehicle during revocation period).

Carrasco-Zelaya was also convicted of leaving the scene of an accident resulting in death in violation of §§ 60-697 and 60-698. Section 60-697 states:

> (1) The driver of any vehicle involved in an accident upon either a public highway, private road, or private drive, resulting in injury or death to any person, shall (a) immediately stop such vehicle at the scene of such accident and ascertain the identity of all persons involved, (b) give his or her name and address and the license number of the vehicle and exhibit his or her operator's license to the person struck or the occupants of any vehicle collided with, and (c) render to any person injured in such accident reasonable assistance, including the carrying of such person to a physician or surgeon for medical or surgical treatment if it is apparent that such treatment is necessary or is requested by the injured person.

Section 60-698 states, in relevant part, that "[a]ny person convicted of violating section 60-697 relative to the duty to stop in the event of certain accidents shall be guilty of . . . a Class III felony if the accident resulted in the death of any person[.]"

According to the evidence presented by the State at trial, Carrasco-Zelaya drove away from the bar in his GMC Acadia at 2:14 a.m. on April 16, 2016; Nava-Luna was with him. At 2:26 a.m., paramedics received the emergency call and responded to the intersection of North 104th Avenue and Manderson Plaza where Nava-Luna's body had been found lying on the road; they pronounced Nava-Luna dead at approximately 2:34 a.m. At 2:46 a.m., Carrasco-Zelaya was arrested at a different location on suspicion of driving under the influence; the subsequent "evidentiary breath test" showed he had .239 grams of alcohol per 210 liters of breath. The GMC Acadia Carrasco-Zelaya was driving at the time of the arrest was impounded. Blood and tissue samples

taken from the rear and underside of the vehicle revealed that Nava-Luna "could not be excluded as the contributor to the [five] DNA sample[s]"; in fact, "The probability of an unrelated individual matching the DNA profile . . . [was] 1 in 38.1 quintillion for Caucasians; 1 in 171 quintillion for African-Americans; and 1 in 1.57 quintillion for American Hispanics." The physician who performed an autopsy on Nava-Luna's body testified the cause of Nava-Luna's death was "Blunt force trauma to the chest and abdomen," which he agreed was consistent with a crush injury from the force or weight of an automobile. According to the State's witnesses, Carrasco-Zelaya backed or ran over Nava-Luna and Nava-Luna's body was drug underneath the vehicle.

Carrasco-Zelaya presented evidence to contradict the State's evidence. However, the district court found the State's evidence more credible. In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. *State v. Cotton, supra*. When the evidence is viewed and construed most favorably to the State, a rational trier of fact could have found the essential elements of motor vehicle homicide and leaving the scene of the accident resulting in Nava-Luna's death beyond a reasonable doubt. Thus, there was sufficient evidence to support Carrasco-Zelaya's convictions.

## CONCLUSION

For the reasons set forth above, we affirm Carrasco-Zelaya's convictions.

AFFIRMED.